**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **NEILL S. BASSI** | ) |
| | ) |
| **Plaintiff/Counter-Defendant,** | ) |
| | ) |
| **v.** | )    **Civil Action No.: 07-1277 (JDB)** |
| | ) |
| **JARROD M. PATTEN, et al.** | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT CASEY T. PATTEN'S**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff, Neill S. Bassi, by undersigned counsel, and pursuant to

this Court's May 23, 2008 Scheduling Order and LCvR 7(h) and LCvR 56.1, opposes

Defendant Casey T. Patten's Motion for Summary Judgment.  In support of his

opposition, Plaintiff refers this Court to the accompanying Counter-Statement of Material

Facts in Dispute and Memorandum of Points and Authorities.

WHEREFORE, Plaintiff requests that Casey T. Patten's Motion for Summary

Judgment be denied.   A proposed order is submitted herewith.

Respectfully submitted,

BODE & GRENIER, LLP

/s/ _____
Eric D. Mitchell (D.C. Bar No. 438607)
Bode & Grenier, L.L.P.
1150 Connecticut Avenue, NW
Ninth Floor
Washington D.C. 20036
Phone: (202) 828-4100
Fax: (202) 828-4130
Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 14th day of July  2008, a copy of the foregoing opposition, accompanying memorandum of points and authorities in support, and proposed order were served by electronic filing upon all counsel in this case.


\_\_\_/s/_____
Eric D. Mitchell

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **NEILL S. BASSI** | ) |
| | ) |
| **Plaintiff/Counter-Defendant,** | ) |
| | ) |
| **v.** | )    **Civil Action No.: 07-1277 (JDB)** |
| | ) |
| **JARROD M. PATTEN, et al.** | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT CASEY T. PATTEN'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Neill S. Bassi ("Bassi"), through counsel, submits this memorandum of points

and authorities in support of his opposition to Defendant Casey T. Patten's motion for summary

judgment.

**I.    Introduction**

This personal injury action arises from a fight in January 2007 outside a bar called Smith

Point, where Bassi worked as a doorman.  When Bassi refused to admit Jarrod Patten and Casey

Patten to the bar, both Pattens insulted Bassi.  Jarrod Patten then ordered Bassi to retrieve his

friend inside the bar.  Bassi declined, which further angered Jarrod Patten. When Bassi's

attempts to reason with Jarrod Patten failed, Bassi stepped back from the doorway to allow

another doorman to take his place in front of Jarrod Patten. Jarrod Patten and Casey Patten

continued to verbally abuse the doormen.  Casey Patten then punched one doorman.   Seconds

later, he threw a second punch at the same doorman, which hit a female bystander.

Jarrod Patten did nothing to restrain or pacify Casey Patten.  Instead, when Casey

Patten's punches induced two doormen to leave the doorway in pursuit, Jarrod Patten had an

unobstructed path to Bassi, and made his move.  Jarrod Patten charged Bassi, grabbed his right

arm, wrenched it backward, severely injuring Bassi's shoulder, and effectively ending Bassi's college lacrosse career.

Casey Patten now moves for summary judgment on Bassi's two claims against him: assault/transferred intent (Count V), and battery (Count VI).  Casey Patten argues that he is entitled to summary judgment on Count V because Bassi could not have been in reasonable apprehension of harm because he was beyond the reach of Casey Patten's punches.  Casey Patten asserts that he is entitled to summary judgment on Count VI because Bassi cannot establish the necessary elements of his aiding and abetting claim.

Neither argument is well taken on the facts or law.  Casey Patten has not met his burden of demonstrating the absence of a genuine issue as to any material facts.  The factual record is riddled with genuine issues of material fact precluding entry of summary judgment on both counts.

## II.    **Background**[1]

Bassi incorporates by reference his Counter-Statement of Material Facts in Dispute ("Pl.'s Facts").  In summary, about thirty minutes after Bassi and two other doormen -- Mike Hill and Greg Davis -- stopped admitting patrons to Smith Point, Jarrod Patten and Casey Patten approached the entrance where Bassi was standing.  Jarrod Patten asked Bassi, "can we get in?" (Bassi Dep. 40:17--41:1, 46:1--47:16, 2/27/08, Ex. A; Bassi Dep. 7:19-22, 3/18/08, Ex. F.)  When Bassi declined the Pattens' request, the Pattens told Bassi that they were on the pre-approved list of admittees and demanded admission.  (Bassi Dep. 50:7-8, 2/27/08, Ex. A.)  Bassi refused to admit them.  Jarrod Patten then ordered Bassi to retrieve his friend inside the bar. (Bassi Dep. 50:8-12, 2/27/08, Ex A.)   Both Pattens appeared intoxicated.  (Pl.'s Answer to

---

[1] Unless otherwise indicated, all facts and alleged factual disputes noted in this section draw from Plaintiff's Counter-Statement of Material Facts in Dispute ("Pl.'s Facts").

Interrog. #2, Ex. E.)  When Bassi defied Jarrod Patten's order to fetch his friend, Jarrod Patten

and Casey Patten grew more hostile and aggressive. (Bassi Dep. 8:3-8, 3/18/08, Ex. F.)

With Jarrod Patten "in his face," Bassi asked Davis to take his place in the doorway, and

Bassi stepped back from the doorway. (Bassi Dep. 53:16--55:11, 2/27/08, Ex. A.)  Both Pattens

moved closer toward the doorway (Bassi Dep. 54:22--55:3, 2/27/08, Ex. A.), where Davis and

Hill stood side by side.  Bassi stood behind them.  Both Pattens continued their verbal abuse of

the doormen.  (Freeman Dep. 34:21--37:7, Ex. L.)

At that point, Casey Patten began throwing punches.  First, Bassi watched Casey Patten,

partially shielded by the larger Jarrod Patten, punch Hill in the face.  (Bassi Dep. 57:8-18,

2/27/08, Ex. A.)  Then, Bassi watched Casey Patten, still shielded by Jarrod Patten, throw a

second punch at Hill, which hit a female bystander in the face. (Bassi Dep. 61:8-10, 2/27/08, Ex.

A.)  Jarrod Patten did nothing to restrain or pacify Casey Patten when he punched either person.

(J. Patten Dep. 70:8-71:4, Ex. K.)

After Casey Patten's second punch struck the female bystander, Hill and Davis stepped

through the doorway in pursuit of Casey Patten  (Pl.'s Answer to Interrog. # 2, Ex. E; Bassi Dep,

63:9-11, 2/27/08, Ex A.)  With no one blocking Jarrod Patten's path to Bassi, Jarrod Patten

charged Bassi, grabbed Bassi's right arm, and wrenched it behind his back, severely injuring his

shoulder.  (Pl.'s Answer to Interrog. # 2, 4-5, Ex. E.)

As soon as Jarrod Patten released Bassi's arm, Casey Patten charged at Bassi (Bassi Dep.

70:1-4, 2/27/08, Ex. A.), which Bassi fended off by using his body, left arm, and Casey Patten's

momentum to take him to the ground.  (Pl.'s Answer to Interrog. #2, 5, Ex. E; Bassi Dep.18:4-

10, 3/18/08, Ex. F.)  When Casey Patten stopped resisting Bassi's attempts to restrain him, Bassi

stood up and entered the bar to notify the owner.  (Bassi Dep. 74:5--75:9, 2/27/08, Ex. A.)

III.    **Standard Of Review**

Entry of summary judgment is proper only where the non-movant can offer no evidence upon which a jury could reasonably find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Although there must be more than a "scintilla" of evidence offered in support of the non-movant's claim, the evidence need only be sufficient to establish the existence of material triable facts. *Id.* at 249-50; *see also id.* at 252.  In reviewing Casey Patten's Motion for Summary Judgment, this Court must assume the truth of Bassi's factual allegations and draw all evidentiary inferences in Bassi's favor.  *Id.* at 255.

IV.    **Argument**

    A.    **Bassi Was Put In Apprehension Of Immediate Harmful Or Offensive Contact When Casey Patten Punched His Co-Worker And A Female Bystander In Front Of Him.**

Casey Patten asserts that his two punches at Mike Hill "did not cause, and could not have caused [Bassi] reasonable apprehension of an immediate and harmful or offensive contact" because Bassi "was at least five or six feet behind Hill . . . and out of the range of the two punches thrown."  (Def.'s Mem. Supp. Summ. J. 4, 5).  This argument fails for several reasons.

        (i)    **Bassi's Sworn Testimony Creates A Question of Fact About How Close He Was To Casey Patten's Punches.**

Casey Patten maintains that Bassi admitted being five or six feet behind Hill when Casey threw two punches at Hill.  (Def.s Mem. Supp. Summ. J. 5).

Bassi made no such admission.

Bassi testified at deposition that when Jarrod Patten became very aggressive toward him, he asked Greg Davis to take his place at the door next to Mike Hill.  Davis did so.  When this happened, Bassi testified that Jarrod Patten became "increasingly more aggressive, stepping closer towards us telling *us* to go fuck ourselves and "Do you know who the fuck we are? We

own this city.'"" (Bassi Dep. 54:22--55:3, Ex. A)(emphasis added.)   When asked how far Jarrod

Patten was from Davis when he made these statements, Bassi testified that he did not know.

　　　　Bassi was then asked:

Q.    You recall him [Jarrod Patten] coming towards you?
A.    Yes
 . . .
Q.    Where were you?
A.    *Maybe* 5 feet back, 6 feet.

(Bassi Dep. 55, 2/27/08, Ex. A)(emphasis added).

　　　　Bassi's testimony shows that he was "maybe" five or six feet back from the threshold

when Jarrod Patten moved toward him, Davis, and Hill.  In other words, contrary to Casey

Patten's assertion that Bassi said that he was "at least" five or six feet behind Hill, Bassi testified

that he was *at most* five or six feet from the threshold, where the doormen faced an advancing

Jarrod Patten.

　　　　This question of fact about Bassi's proximity to Jarrod Patten, Casey Patten, and Mike

Hill precludes summary judgment.

### (ii)  Casey Patten's Argument Has No Legal Basis.

　　　　Casey Patten declares that Bassi could not reasonably have been in apprehension of

imminent harmful or offensive contact because he was "at least five or six feet" behind Casey

Patten's target.   Casey Patten does not cite this Court to any authority which supports the

argument that "five or six feet" is the spatial limit beyond which no person can be in "reasonable

apprehension of an imminent harmful or offensive contact."  No such authority exists.

### (iii)    Bassi's Apprehension Is Measured By A Reasonable Person Standard, Not Casey Patten's Subjective Opinion.

　　　　Under District of Columbia law, "[t]o constitute the tort of assault, the apprehension must

be one which would normally be aroused in the mind of a reasonable person and apparent ability

and opportunity to carry out the threat immediately must be present." *Rogers v. Loews L'Enfant Plaza Hotel*, 526 F. Supp. 523, 529 (D.D.C. 1981)(quoting W. Prosser, *The Law of Torts*, note 7, §10, at 38-39 (4th ed. 1971)).  Here, whether a reasonable person could have been in apprehension of an immediate harmful or offensive contact from Casey Patten is a disputed issue of fact.  Viewed in the light most favorable to Bassi, the facts show that:

- Jarrod Patten stood eighteen inches from Bassi when he spoke to Bassi at the entrance to Smith Point. (J. Patten Dep. 51:21, Ex. K).  Casey Patten was with Jarrod Patten, and standing partially behind him. (J. Patten Dep. 60:14-15, Ex. K.)

- Both Pattens appeared intoxicated to Bassi. (Pl.'s Answer to Interrog. #2, Ex. E)

- When Bassi informed the Pattens they were too late to get in, both Pattens demanded that Bassi retrieve their friends inside the bar.  (Jarrod Patten Dep. 55:15--56:2, Ex. K.)

- When Bassi did not follow the Pattens' orders, the Pattens became more aggressive.  Their menacing conduct prompted Bassi to ask Greg Davis to take his place in front of the Pattens. (Bassi Dep. 53:16--5:19, 2/27/08, Ex. A.)

- Bassi stepped back from the doorway, but remained in full view and within earshot of both Pattens. (Bassi Dep. 54:22—55:3, 2/27/08, Ex. A.)

- Bassi saw Jarrod Patten, with Casey Patten partially behind him, move toward the doormen. (Bassi Dep. 54:22--56:16, 2/27/08, Ex. A.)

- Casey Patten's aggressive behavior, and Jarrod Patten's verbal abuse of the doormen, caused a casual bystander -- Hannah Freeman -- to fear the outbreak of violence.  (Freeman Dep. 36:20-24, Ex. L.)

- Ms. Freeman tried to protect herself by moving inside the door.  (Freeman Dep. 35:4-36:24, Ex. L.)

- Bassi saw Casey Patten punch the doorman near him, Mike Hill, in the face. (Bassi Dep. 57:8-18, 2/27/08, Ex. A.)

- The Pattens held their position infront of the doormen after Casey Patten hit Hill. (Hill Dep. 40:12-18, Ex. B.)

- Bassi then saw Casey Patten throw a second punch at Hill, which hit Freeman. (Bassi Dep. 61:8-22, 2/27/08, Ex. A.)

- Bassi watched Davis and Hill step through the doorway, leaving Bassi alone at the threshold. (Bassi Dep. 63:9-11, 2/27/08, Ex. A.)

"The essence of an assault is an overt threatening physical gesture." *Kalantar v. Lufthansa*, 402 F. Supp. 2d 130, 142 (D.D.C. 2005)  Here, the Court cannot say on the above facts that no reasonable person could have reasonably been in  apprehension of immediate harmful or offensive contact.  This is particularly true because a witness to Casey Patten's behavior outside Smith Point, Hannah Freeman, tried to take cover before Casey Patten started throwing punches at the doormen.  Casey Patten's second punch still hit her in the face.

Casey Patten's motion for summary judgment on Count V should be denied.

**B.  There Is Evidence To Create Joint Liability For Jarrod Patten's Battery**

Casey Patten asserts that he is entitled to summary judgment on Count VI because "there is a complete absence of evidence that the two defendants were working in concert to injure Plaintiff, that any overall plan to injure Plaintiff existed, or that anything Casey Patten did exacerbated or is otherwise causally related to Plaintiff's injury."  (Def.'s Mem. Supp. Summ. J. 6,7.)  Because there is sufficient evidence for a reasonable jury to find Casey Patten liable for aiding and abetting, his motion for summary judgment should be denied.

The elements of aiding and abetting liability are spelled out in *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983): (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam* also explains that liability for aiding and abetting often turns on the level of encouragement provided by the aider and abettor. *Id*. at 478.  *Halberstam* recognized five factors in making this determination: (i) the nature of the act encouraged, (ii) the amount of assistance

given by the defendant, (iii) his presence or absence at the time of the tort, (iv) his relation to the other tortfeasor, and (v) his state of mind. *Id.*

Here, there are facts in the record from which a reasonable juror could infer that Casey Patten substantially encouraged the wrongful activity -- imposing mayhem on the doormen at Smith Point -- that resulted in Bassi's injury. That Jarrod Patten and Casey Patten were working in concert can be inferred from the following:

- Jarrod and Casey approached Smith Point together and told Bassi that *they* wanted to be admitted.

- When Bassi declined to admit them, *they* both demanded that Bassi leave his post at the door and find *their* friends inside.

- When Bassi and his fellow doormen refused to follow the Pattens' orders, Jarrod Patten challenged the doormen by saying "do you know who . . . *we* are? *We* own this city."

- Both Pattens moved closer to the doormen while insulting and threatening them.

- Jarrod and Casey Patten stayed close to each other as they squared off with the doormen.

- Casey Patten threw a punch at Mike Hill while partially shielded by the larger Jarrod Patten.

- Jarrod Patten did not try to restrain or pacify Casey Patten after his first punch.

- Jarrod Patten held his position at the threshold, thus blocking Hill's path to Casey Patten, yet, at the same time, providing coverage for Casey Patten to throw another punch at Hill.

- With Jarrod partially shielding him, Casey Patten threw a second punch at Hill, which drew the doormen away from the doorway, and away from Bassi.

- With no doormen blocking his path to Bassi, Jarrod Patten charged Bassi and injured him.

Although Casey Patten maintains that there is no evidence that anything he did is related to Bassi's injury at the hands of Jarrod Patten, on this record a rational jury could find otherwise. There is evidence from which a jury could find that Casey and Jarrod Patten's creation of a chaotic free-for-all outside Smith Point, was both dangerous and ultimately injurious for Bassi, for which Casey Patten is liable. *Halberstam*, 705 F.2d at 482 (citing *Keel v. Hainline*, 331 P.2d 397 (Okla. 1958)(noting that a student who only aided some eraser throwing among other students by retrieving and handing erasers to the participants, was liable for an eye injury to a non-participant because he had substantially encouraged the wrongful activity that resulted in injury.)

Casey Patten was an active participant in the chaos that Jarrod Patten and Casey Patten initiated at Smith Point, and which led to Jarrod Patten's battery of Bassi. Casey Patten's motion for summary judgment on Count VI should be denied.

## V.    <u>Conclusion</u>

For the foregoing reasons, the Court should deny Defendant Casey T. Patten's Motion for Summary Judgment.

Respectfully submitted,

**BODE & GRENIER, LLP**

_____
Eric D. Mitchell
D.C. Bar No. 438607
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, D.C. 20036
Telephone: (202) 862-4315
Facsimile: (202) 828-4130
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 14th day of July 2008, a copy of the foregoing memorandum of points and authorities in opposition to Defendant Casey T. Patten's motion for summary judgment was served by electronic filing upon all counsel in this case.


____/s/_____
Eric D. Mitchell

**Capital Reporting Company**

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

----------------------------------------x

Neill S. Bassi                          :

    Plaintiff/Counter-Defendant,    :

              v.                   : C.A. No:

Jarrod M. Patten and Casey T. Patten  : 07-1277(JDB)

    Defendants/Counter-Plaintiffs.:

----------------------------------------x

                    Washington, D.C.

           Wednesday, February 27, 2008

Deposition of:

           NEILL BASSI

called for oral examination by counsel for Defendant

Jarrod Patten, pursuant to notice, at the Law Offices

of Mallon & McCook, 1776 K Street, Northwest, Suite

200, Washington, D.C., before Jacqueline Schultes,

Registered Professional Reporter and Certified Realtime

Reporter, beginning at 10:36 a.m., when were present on

behalf of the respective parties:

# Capital Reporting Company

Page 34

1  how you were to behave in your position at Smith Point?
2      A.  No.
3      Q.  Did he outline to you what your duties and
4  responsibilities were outside of what you've described,
5  how you should interact with patrons and so forth?
6      A.  No.
7      Q.  Did you receive any training whatsoever at
8  Smith Point in the use of force?
9      A.  No.
10     Q.  Did anyone ever complain to your knowledge
11 about your use of force while you worked at Smith
12 Point?
13     A.  No.
14     Q.  At Rhino?
15     A.  No.
16     Q.  While you were at Rhino or Smith Point did
17 you witness any employees in those establishments
18 involved in physical altercations with patrons?
19     A.  Yes.
20     Q.  Explain.
21     A.  Actually, I did not witness, so, correction;
22 but I heard.

Page 35

1      Q.  What did you hear?
2      A.  One of the door guys had gotten fired by Bo
3  for getting too physical with one of the patrons.
4      Q.  Following that incident did Bo have any
5  conversations with you or communicate to you in writing
6  where that line was drawn with respect to physical
7  contact with patrons?
8      A.  Yes.
9      Q.  What did he tell you?
10     A.  Sent us an e-mail.
11     Q.  What did it say in the e-mail?
12     A.  I don't remember.
13     Q.  With the exception of the incident giving
14 rise to this complaint, were you involved in any other
15 physical altercations while you were employed at Smith
16 Point?
17     MS. SHEEHAN:  Objection.  You can answer the
18 question if you understand.
19     THE WITNESS:  No.
20 BY MR. McCOOL:
21     Q.  Since you have been at Georgetown University
22 have you been involved in any fights outside of the

Page 36

1  areas that we just discussed, that is, the work
2  environment?
3      A.  No.
4      Q.  Do you know a man by the name of Winston
5  Lord?
6      A.  I don't know him.  I know of him.
7      Q.  Have you met him?
8      A.  A few times.
9      Q.  What do you know of him?
10     A.  If I remember correctly, he has gray hair,
11 nice guy, soft-spoken, always cordial.
12     Q.  What was his relationship with Bo Blair, if
13 you know?
14     A.  I don't know.
15     Q.  How late was Smith Point open when you worked
16 there?
17     A.  It varied.
18     Q.  Explain that.
19     A.  Normally we close at 2:00.  Some days we
20 would go a little later, maybe five or ten minutes.
21 Sometimes we would have to close the doors earlier,
22 depending on how busy it was.

Page 37

1      Q.  Did you ever let patrons in after 2:30?
2      A.  No.
3      Q.  You have never let a patron inside Smith
4  Point after 2:30?
5      A.  Not that I remember.
6      Q.  Bo Blair never asked you to let someone in
7  after 2:30?
8      A.  I don't know.
9      Q.  You don't recall?
10     A.  I don't know.
11     Q.  You don't know whether or not Bo Blair asked
12 you to let someone in?
13     A.  I don't recall.
14     Q.  Did Winston Lord or anyone else ask you to
15 let a patron inside Smith Point after 2:30?
16     A.  I don't recall.
17     Q.  Directing your attention if I may to January
18 13th which was a Saturday; do you recall?
19     A.  Yes.
20     Q.  Describe what you did during the day on
21 January 13th, 2007.
22     A.  I don't remember.

# Capital Reporting Company

11 (Pages 38 to 41)

| Page 38 | |
|---|---|
| 1 | Q.  Do you know what time you got up? |
| 2 | A.  No. |
| 3 | Q.  Do you know if you exercised at all? |
| 4 | A.  No. |
| 5 | Q.  Do you remember whether you ate lunch or what |
| 6 | you had for lunch rather? |
| 7 | A.  No. |
| 8 | Q.  Do you know whether you took Ridilan that |
| 9 | day? |
| 10 | A.  No. |
| 11 | Q.  No, you don't remember or, no, you didn't |
| 12 | take it? |
| 13 | A.  Most likely did not take it on a Saturday and |
| 14 | no, I don't remember. |
| 15 | Q.  Did you consume any alcohol that day? |
| 16 | A.  No. |
| 17 | Q.  Did you take any other prescription medicine |
| 18 | or narcotics that day? |
| 19 | A.  No. |
| 20 | Q.  At some point on January 13th, 2007, did you |
| 21 | report for work at Smith Point? |
| 22 | A.  Yes. |

| Page 39 | |
|---|---|
| 1 | Q.  What time did you arrive at Smith Point? |
| 2 | A.  Roughly 10:00. |
| 3 | Q.  At night? |
| 4 | A.  Yes, yes. |
| 5 | Q.  After you arrived at Smith Point, did you |
| 6 | have any alcohol to drink? |
| 7 | A.  No. |
| 8 | Q.  Did you ever drink while you worked at Smith |
| 9 | Point? |
| 10 | A.  No. |
| 11 | Q.  How about after you got off of work, did you |
| 12 | ever have a drink at the bar after you finished for the |
| 13 | night? |
| 14 | MR. MITCHELL:  Objection. |
| 15 | BY MR. McCOOL: |
| 16 | Q.  Answer the question. |
| 17 | A.  Yes. |
| 18 | Q.  How often would you drink after you've |
| 19 | finished your shift? |
| 20 | MR. MITCHELL:  Objection.  You can answer. |
| 21 | THE WITNESS:  Rarely.  I don't know how |
| 22 | often, but not often. |

| Page 40 | |
|---|---|
| 1 | BY MR. McCOOL: |
| 2 | Q.  What would you drink? |
| 3 | A.  I don't know.  A beer. |
| 4 | Q.  Beer, vodka, scotch, what would you drink? |
| 5 | A.  Probably just a beer.  I don't know. |
| 6 | Q.  Unless Mr. Mitchell or Ms. Sheehan instructs |
| 7 | you not to answer, just go ahead and answer it. |
| 8 | A.  Okay. |
| 9 | Q.  While you were working at Smith Point did |
| 10 | there come a time after midnight when two men |
| 11 | approached the O Street entrance who you came to know |
| 12 | as Jarrod Patten and Casey Patten? |
| 13 | A.  On the 13th or this would be the 14th? |
| 14 | Q.  It would be the 14th if it was after |
| 15 | midnight. |
| 16 | A.  Yes. |
| 17 | Q.  What time did Casey and Jarrod Patten |
| 18 | approach -- |
| 19 | A.  About 2:30 a.m. |
| 20 | Q.  Still on the 14th? |
| 21 | A.  Yes. |
| 22 | Q.  What time did Smith Point close that morning? |

| Page 41 | |
|---|---|
| 1 | A.  2:00. |
| 2 | Q.  Describe Mr. Patten, what did he look like? |
| 3 | MR. MITCHELL:  Which Mr. Patten? |
| 4 | MR. McCOOL:  Jarrod Patten, excuse me, thank |
| 5 | you. |
| 6 | THE WITNESS:  He was large. |
| 7 | BY MR. McCOOL: |
| 8 | Q.  Describe him, sir.  How tall is he, how much |
| 9 | did he weigh approximately? |
| 10 | A.  You have to keep in mind they were on a step |
| 11 | so he looked pretty tall.  Probably 6-3, 6-4, 220, 230, |
| 12 | wearing a dark coat and like black silver kind of hair. |
| 13 | Q.  You said he had a dark coat.  Was it a long |
| 14 | coat? |
| 15 | A.  How long? |
| 16 | Q.  Was it like a dress coat or how long did it |
| 17 | go down?  Could you tell what else he was wearing -- |
| 18 | A.  Looked like a pea coat. |
| 19 | Q.  Can you describe what else he was wearing |
| 20 | that night? |
| 21 | A.  Pants. |
| 22 | Q.  What color? |

## Capital Reporting Company

12 (Pages 42 to 45)

Page 42

1    A. I don't remember.
2    Q. You're sure they were pants, though, right?
3    A. Yes.
4    Q. You said there came a time when you
5    acknowledged there came a time when you learned their
6    names were Jarrod Patten and Casey Patten. When did
7    you learn that information?
8    A. I had heard fragments of their names. I
9    wasn't sure if their actual name was Casey Patten until
10   I searched Casey Patten, Washington, D.C., in a Google
11   search and I saw a picture of him loading a box or
12   something on the Washington, D.C. Post and then I
13   recognized his face immediately.
14   Q. Describe this -- it was a Washington Post
15   article?
16   A. Yes.
17   Q. Did you read the article?
18   A. Yes.
19   Q. What was it about?
20   A. Only the Good Buy Young I think was the
21   title.
22   Q. What was the substance of the article, if you

Page 43

1    can summarize it briefly?
2    A. Real estate, flipping houses, I think.
3    Q. How did you come to learn Jarrod Patten's
4    name, unless you learned it through your attorneys, but
5    if you didn't learn it through your attorneys, tell me
6    how you came to that information?
7    A. I don't know.
8    Q. Did you see Casey Patten prior to January
9    14th, 2007?
10   A. No.
11   Q. Did you see Jarrod Patten at any time before
12   January 14th, 2007?
13   A. No.
14   Q. Where were you located when you saw Jarrod
15   and Casey Patten on January 14th, 2007?
16   A. At Smith Point.
17   Q. Can you be more specific?
18   A. The street of O where the metal doors are, I
19   was on the inside of the metal doors.
20   MR. McCOOL: Let's go off the record for a
21   moment.
22   (Whereupon, a short recess was taken.)

Page 44

1    (Exhibit Number NB5 marked for
2    identification.)
3    BY MR. McCOOL:
4    Q. Mr. Bassi, I'm showing you what's been marked
5    NB5. It's a Xerox copy of photographs produced in
6    discovery. Do you recognize that paragraph?
7    A. I recognize what's in the photograph.
8    Q. Do you recognize what is depicted there?
9    A. Yes.
10   Q. What is it?
11   A. It's the O Street entrance.
12   Q. In looking at that photograph can you see
13   where you were positioned when you first saw Casey
14   Patten and Jarrod Patten on January 14th, 2007?
15   A. Yes.
16   Q. I'm going to hand you a blue marking pen.
17   Could you just put your initials "NB" and then just put
18   a "1" and circle the one next to that?
19   A. You do realize the doors were flipped that
20   night.
21   Q. Let me get you to mark where you were
22   standing if you see it there. Wait a second, before

Page 45

1    you do that, I understand where you are going with
2    this. Is it fair to say, then, that you cannot see
3    where you were standing?
4    A. I know where I was standing but it will be
5    tough for you.
6    Q. That's why I phrased the question the way I
7    did. So in this photograph NB5 there is a double door,
8    one is flipped open and one is closed; is that a fair
9    description of what's shown here in this Exhibit?
10   A. Yes.
11   Q. Based on our earlier exchange, is it fair to
12   say that you were behind the closed door, although it
13   was open on that morning?
14   A. No.
15   Q. Where were you in this photograph?
16   A. Here (indicating).
17   MR. McCOOL: Let the record reflect that the
18   witness is pointing down the center line where the two
19   double doors would meet if they were both closed.
20   BY MR. McCOOL:
21   Q. Were you seated or were you standing?
22   A. When?

## Capital Reporting Company

13 (Pages 46 to 49)

Page 46

1  Q.  When they first approached, Mr. Casey Patten
2  and Mr. Jarrod Patten?
3  A.  Standing.
4  Q.  Were there any ropes or poles or anything
5  positioned outside the O Street entrance, those two
6  metal doors there?
7  A.  Yes.
8  Q.  Where were they located, if you could just
9  describe that?
10  A.  There would have been a pole touching this
11  door and a pole touching that door.
12  Q.  Let me take that from you. I want you to
13  describe it so we can understand it from the written
14  record.
15  A.  Those doors would be flipped. The one that's
16  opened, there will be a pole on the outside keeping
17  that door open against the planter towards the dog
18  store to the left. The one that's closed, there will
19  be a pole on the outside.
20  Q.  Are there any ropes connecting these poles?
21  A.  When?
22  Q.  To each other or to something else that is

Page 47

1  outside the O Street doors.
2  MS. SHEEHAN: At what point in time?
3  BY MR. McCOOL:
4  Q.  When you were standing where you described
5  just inside the door when Mr. Casey Patten and
6  Mr. Jarrod Patten approached you on the morning of
7  January 14th.
8  A.  No.
9  Q.  Were Jarrod Patten and Casey Patten together
10  when they approached the O Street entrance on the
11  morning of January 14th?
12  A.  Yes.
13  Q.  Identify all other persons who were in or
14  around that area on January 14th when Casey Patten and
15  Jarrod Patten approached the O Street entrance.
16  A.  I will identify everyone I know. Mike Hill,
17  Greg Davis, myself, and although I do not know her
18  personally, I found out later, Hanna Freeman was there
19  also.
20  Q.  Any other individuals present at that time?
21  A.  I don't know.
22  Q.  Was there a person by the name of Jay who

Page 48

1  worked at Smith Point while you were working there?
2  A.  There is, yes.
3  Q.  Could you describe him for the record.
4  A.  Shorter, facial hair, not very lean, not
5  super fat.
6  Q.  Do you know his last name?
7  A.  I do not.
8  Q.  What is his race?
9  A.  He is African.
10  Q.  When you say "African" do you draw a
11  distinction between African and African-American? Did
12  he have like an African sounding last name?
13  A.  I know he's from Africa.
14  Q.  Did you see Jay that morning at all?
15  A.  Yes.
16  Q.  He was working at that time, then?
17  A.  Yes.
18  Q.  How were you dressed that morning? What were
19  you wearing?
20  A.  Green pants; white shoes; blue mountain
21  hardware rain jacket, kind of like a ski jacket; a
22  Smith Point polo shirt; a white T-shirt underneath.

Page 49

1  Q.  How was Mike Hill dressed that morning?
2  A.  A jacket, pants, wearing like a ski cap.
3  Q.  What color was the ski cap?
4  A.  Red.
5  Q.  What color was the jacket?
6  A.  I don't remember.
7  Q.  Do you recall what color the pants were?
8  A.  No.
9  Q.  How was Greg Davis dressed that morning?
10  A.  About the same, jacket, pants, shoes.
11  Q.  Do you recall the color of the jacket or the
12  color of his pants?
13  A.  No.
14  Q.  Can you describe what Jay was wearing that
15  morning?
16  A.  Jacket, pants.
17  Q.  Can you describe it any further with any more
18  detail than that?
19  A.  No.
20  Q.  Describe what happened after Jarrod and Casey
21  Patten approached the O Street entrance.
22  A.  They asked to be let into Smith Point.

# Capital Reporting Company

14 (Pages 50 to 53)

| Page 50 | Page 52 |
|---|---|

**Page 50**

1    Q.  Just tell it in your own words what happened
2    after they approached the O Street entrance.  That's
3    it, they just asked to be let in Smith Point?
4    A.  A lot happened that night.
5    Q.  I'm giving you the opportunity to tell me.
6    A.  They asked to be let into Smith Point and we
7    said, "No, the doors are closed."  They said they were
8    on the list.  We said, "We're sorry, the bar is closed.
9    No more list tonight."  They then proceeded to say they
10   knew Bo Blair and that we should go downstairs and go
11   get Bo.  I then told them that "If you know Bo that you
12   could call Bo and Bo will come get you, himself."
13   Q.  During that portion of the incident, if you
14   will, do you recall any specific words that Jarrod
15   Patten used?
16   A.  Yes.
17   Q.  Tell me what words you remember.
18   A.  "I'm on the list.  I know Bo.  Go get Bo."
19   Q.  Describe his tone of voice.
20   A.  Authoritative.
21   Q.  Do you recall words that Casey Patten used
22   during that part of the incident?

**Page 51**

1    A.  He was not speaking.
2    Q.  Did you check to see if they were on the
3    list?
4    A.  No.
5    Q.  Describe your tone of voice when you said,
6    "If you know Bo call him yourself and he'll let you in
7    or come get you, himself."
8    A.  Apathetic, tired, indifferent.
9    Q.  Any other descriptive words come to mind?
10   A.  No.
11   Q.  Would it be fair to say that you were
12   dismissive of them when you said "Go call Bo yourself"?
13   A.  Indifferent.
14   Q.  Is dismissive an accurate description?
15       MS. SHEEHAN:  Objection.  You can answer.
16       THE WITNESS:  Can you give me an example of
17   dismissive?
18   BY MR. McCOOL:
19   Q.  You don't understand what the word
20   "dismissive" means?
21   A.  Correct.
22   Q.  Would it be fair that someone could describe

**Page 52**

1    your manner at that point as dismissive?
2        MS. SHEEHAN:  Objection.  You can answer.
3        THE WITNESS:  No.
4    BY MR. McCOOL:
5    Q.  Why not?
6    A.  They'd never met me before.  I was aloof.  I
7    was tired.  We look forward to the late night every
8    night because it means we're closed, nobody else gets
9    in.  People come up and we tell them not to come in.
10   Q.  What do you mean you were aloof?
11   A.  It's the end of the night and we're tired.
12   We've been sitting up there for a few hours.
13   Q.  So what do you mean by "aloof"?
14   A.  Indifferent to whether people were going to
15   get in right now because the bar's closed.
16   Q.  Could you describe Jarrod Patten's tone of
17   voice, other than authoritative?
18   A.  When?
19   Q.  During this part of the incident.
20   A.  Just those few words that I just recited?
21   Q.  Yes.
22   A.  Commanding.

**Page 53**

1    Q.  Did he yell at you?
2    A.  Not yet.
3    Q.  Was he screaming at you at this point?
4    A.  Not yet.
5    Q.  At this point he was not screaming at you?
6    A.  No.
7    Q.  What did Jarrod Patten do after you told him
8    he could call Bo Blair himself?
9    A.  He said, "Fuck you."
10   Q.  What was your response?
11   A.  Okay.  I don't remember my exact response,
12   but I know soon after I turned and switched places with
13   Greg.
14   Q.  Keep your voice up, Mr. Bassi.  What do you
15   mean you turned and switched places with Greg?
16   A.  After he started getting aggressive saying,
17   "Fuck you, you go get Bo," I was tired.  I didn't want
18   to deal with another drunk asshole in the night so I
19   turned and asked Greg to take my place.
20   Q.  You didn't say anything to Jarrod Patten at
21   that point?
22   A.  I said, "You go call Bo."

## Capital Reporting Company

15 (Pages 54 to 57)

|  |  |
|---|---|
| Page 54 | Page 56 |

**Page 54**

1  Q.  We've already gone over that.
2  A.  So no.
3  Q.  You just turned and had Greg Davis take your
4  place?
5  A.  Yes.
6  Q.  What did you say to Greg Davis to cause him
7  to change places with you?
8  A.  I don't remember.
9  Q.  What did Greg Davis do after he changed
10  places with you?
11  A.  He took my spot at the door.
12  Q.  Where was Mike Hill at that point?
13  A.  At the door as well.
14  Q.  Where in relation to Greg Davis?
15  A.  To the left.
16  Q.  Where was Jay?
17  A.  I don't know.
18  Q.  Where was Hanna Freeman?
19  A.  Next to Mike Hill.
20  Q.  What happened after Greg Davis took your
21  place?  Describe what was said and what happened.
22  A.  Jarrod becomes increasingly more aggressive,

**Page 55**

1  stepping closer towards us telling us to go fuck
2  ourselves and "Do you know who the fuck we are?  We own
3  this city."
4  Q.  When he said, "We own this city," how far was
5  he from Greg Davis?
6  A.  I don't know.
7  Q.  You don't know because you don't recall or
8  you don't know because you didn't see?
9  A.  I don't know because I don't recall.
10  Q.  You recall him coming towards you?
11  A.  Yes.
12  Q.  What did Greg Davis say in response?
13  A.  I don't know.
14  Q.  You don't know because you don't recall or
15  you don't know because you didn't hear?
16  A.  I don't know because I didn't hear.
17  Q.  Where were you?
18  A.  Maybe 5 feet back, 6 feet.
19  Q.  After Greg Davis took your place at the
20  O Street entrance and you stepped back 5 or 6 feet as
21  you just testified, can you see in NB5 where you were
22  located or is your position obstructed by the door or

**Page 56**

1  something else?
2  A.  You can see it.
3  Q.  Where?  Can you point to it, please, where
4  you were standing.
5  A.  If Greg Davis is here and this is an accurate
6  picture and this is roughly 5 or 6 feet back, then this
7  is where I'm standing.
8  Q.  Write your initials there, please, and put
9  the number "2" above the "B."
10  A.  (Witness complies).
11  Q.  Could you see Jarrod Patten from that
12  position?
13  A.  Yes.
14  Q.  Could you see Casey Patten from that
15  position?
16  A.  Yes.
17  Q.  Could you see Jay from that position?
18  A.  I don't know where he was.
19  Q.  Could you see Mike Hill from that position?
20  A.  Yes.
21  Q.  And you could see Greg Davis from where you
22  were standing there?

**Page 57**

1  A.  Yes.
2  Q.  What happened next?
3  Q.  Where did we leave off?
4  Q.  Jarrod Patten said, according to you, "I own
5  this town."
6  A.  "We own this city."
7  Q.  What happened after that?
8  A.  At some point in time very quickly after that
9  Casey Patten throws a punch at one of the door guys.
10  Q.  Who did he throw a punch at?
11  A.  Michael Hill.
12  Q.  Did the punch connect?
13  A.  Yes.
14  Q.  Did you see it connect?
15  A.  Yes.
16  Q.  Where did Mr. Patten, Casey Patten's fist
17  strike Mike Hill?
18  A.  His face.
19  Q.  What part of his face?
20  A.  I don't recall.
21  Q.  Did Casey Patten say anything prior to
22  punching Mike Hill in the face?

## Capital Reporting Company

16 (Pages 58 to 61)

Page 58

1    A.  I don't know.
2    Q.  Up to this point did you hear Casey Patten
3  say anything?
4    A.  I don't recall.
5    Q.  Did you remain in that same spot that you
6  marked on NB5 after Casey Patten punched Mike Hill in
7  the face?
8    A.  Yes.
9    Q.  You didn't move in any direction after this
10  punch was thrown, you remained right there?
11    A.  Yes.
12    Q.  What happened after Casey Patten threw the
13  punch that hit Mike Hill?
14    A.  Mike Hill then grabbed Jarrod Patten's coat
15  and I think he was trying to pull him inside.
16    Q.  He grab Jarrod Patten, the bigger of the two?
17    A.  Yes.
18    Q.  And tried to drag him inside the O Street
19  entrance?
20    A.  I wouldn't say he tried to drag him inside,
21  but he was pulling on his jacket.
22    Q.  Pulling him towards the inside of the

Page 59

1  O Street entrance?
2    A.  Towards himself.
3    Q.  Was he inside the threshold of the door or
4  outside of the threshold of the O Street entrance door?
5    A.  Who?
6    Q.  Mike Hill.
7    A.  Yes.
8    Q.  Was he inside or outside the door, Mike Hill?
9    A.  Inside.
10    Q.  Where was Casey Patten when Mike Hill grabbed
11  Jarrod?
12    A.  Behind Jarrod.
13    Q.  What did Jarrod Patten do after Mike Hill
14  grabbed him?
15    A.  Didn't allow himself to be pulled into the
16  door.
17    Q.  How did he go about doing that?
18    A.  I don't know.  He's a big guy.
19    Q.  That may be true, but I'm asking you what did
20  you observe that led you to conclude that he was trying
21  to stop Michael Hill from pulling him inside the door?
22    A.  Stepped back.

Page 60

1    Q.  Did he throw a punch?
2    A.  Who?
3    Q.  Jarrod Patten.
4    A.  No.
5    Q.  Did he try to slap Michael Hill?
6    A.  No.
7    Q.  Did he try to push him?
8    A.  I don't know.
9    Q.  You didn't see him try to push him?
10    A.  I don't remember.
11    Q.  You have no recollection sitting here today
12  that Jarrod Patten attempted to push Michael Hill after
13  Michael Hill grabbed him on January 14th, do you?
14    A.  No.
15    Q.  What did Jarrod Patten say as this part of
16  the incident was unfolding?
17    A.  I don't know.
18    Q.  You have no recollection?
19    A.  No.
20    Q.  What, if anything, did Casey Patten say at
21  this point of the incident?
22    A.  I don't recall.

Page 61

1    Q.  Was Michael Hill successful in pulling Jarrod
2  Patten inside the O Street entrance?
3    A.  No.
4    Q.  What happened as he was trying to pull him
5  inside the O Street entrance?
6    A.  I already answered that question.
7    Q.  What happened next?  What was going on?
8    A.  He was unable to pull Jarrod Patten inside,
9  at which point his younger brother Casey throws a
10  second punch at Mike Hill.
11    Q.  Did that punch strike Mike Hill?
12    A.  I don't know.
13    Q.  The second punch?
14    A.  I don't know.
15    Q.  Did you see the second punch strike anyone?
16    A.  Yes.
17    Q.  Who did you see the strike?
18    A.  A girl that was standing next to Mike.
19    Q.  Did you later come to learn her name?
20    A.  Yes.
21    Q.  What is her name?
22    A.  Hanna Freeman.

# Capital Reporting Company

17 (Pages 62 to 65)

Page 62

1  Q.  Where did this punch strike her?
2  A.  I believe in the mouth, in the face.  I don't
3  know exactly if it was the mouth, but the face.
4  Q.  Up to this point had you moved from where you
5  were standing inside the O Street entrance?
6  A.  Maybe a step forward or backward.  I mean, I
7  wasn't standing like a soldier, but not down the
8  stairs.
9  Q.  Did you say anything to Jarrod Patten up to
10  this point?
11  A.  No.
12  Q.  Did you say anything to Casey Patten up to
13  this point?
14  A.  No.
15  Q.  Did you have a cell phone with you that
16  morning?
17  A.  Yes.
18  Q.  Did you call the police?
19  A.  No.
20  Q.  Did you call for Bo or anyone else from
21  inside the establishment?
22  A.  No.  We told them we were going to call the

Page 63

1  cops if they didn't leave.
2  Q.  When did that happen?
3  A.  From as soon as they got there to the last
4  punch that was thrown.
5  Q.  After Hanna Freeman, what happened next?
6  A.  Can you repeat the question.
7  Q.  After Hanna Freeman was struck, what happened
8  next?
9  A.  Once Hanna Freeman was struck Greg Davis and
10  Mike Hill proceeded out to the right of the door and I
11  walk out the front of the door straight.
12  Q.  Where did Greg Davis go when he went outside
13  the door?
14  A.  To the right.
15  Q.  What did he do as he moved to the right
16  outside the O Street entrance?
17  A.  I don't know.
18  Q.  Did he come in contact with anyone?
19  A.  I don't know.
20  Q.  At any point did you see Greg Davis come in
21  contact with anyone that evening?
22  A.  Yes.

Page 64

1  Q.  Who did you see him come into contact with?
2  A.  Jarrod Patten.
3  Q.  Describe that.
4  A.  He was holding him up against the wall.
5  Q.  What wall?
6  A.  This wall over here (indicating).
7  Q.  That was much later in the night?
8  A.  It was after -- that's quite a jump ahead,
9  but, yes.
10  Q.  So Greg Davis goes out the O Street entrance
11  to the right?
12  A.  Correct.
13  Q.  And you don't see where he goes?
14  A.  Mike Hill and him go to the right.
15  Q.  You didn't see where Mike Hill or Greg Davis
16  went when they left the O Street entrance and went
17  towards the right?
18  A.  No.
19  Q.  Did you see Jarrod Patten at that point?
20  A.  No.
21  Q.  Did you see Casey Patten at that point?
22  A.  No.

Page 65

1  Q.  Do you know whether or not Mike Hill and/or
2  Greg Davis were moving towards either Casey Patten or
3  Jarrod Patten when they left the O Street entrance?
4  A.  No.
5  Q.  Before Greg Davis and Mike Hill left the
6  O Street entrance did you see where Jarrod Patten went?
7  A.  I think he backed up.
8  Q.  Towards O Street?
9  A.  After they had pushed out, I think he took a
10  step back in order for them to come out.
11  Q.  Did you see him standing there on the
12  sidewalk near O Street?
13  A.  Not until the last second.
14  Q.  Tell me what happened in your own words and
15  let's start at the point where Hanna Freeman is struck.
16  What did you see, what did you hear and what did you
17  do?
18  MS. SHEEHAN:  Objection.  You can answer.
19  THE WITNESS:  Hanna Freeman gets struck in
20  the face, head bangs back.  Once we had realized that,
21  Mike Hill and Greg Davis go out to the right of the
22  door.

## Capital Reporting Company

Page 66

1  BY MR. McCOOL:
2     Q.  Do you know why at that point they go out to
3  the right?
4     A.  I would imagine to restrain the person that
5  was assaulting us and the patrons.
6     Q.  Who would that be?  Would that be Casey
7  Patten?
8     A.  That would be Casey Patten.  I don't see Mike
9  Hill and Greg Davis because as I come out the door
10  Jarrod Patten comes at me and grabs my right arm.  As
11  he comes at me I put my hands up, grabs my right arm
12  and wrenches it behind my back spinning me around.
13     Q.  Did this occur inside the O Street entrance
14  or outside the O Street entrance?
15     A.  Outside.
16     Q.  On the sidewalk?
17     A.  Correct.
18     Q.  Where in relation to the O Street entrance,
19  directly in front of it, was it towards Wisconsin
20  Avenue or towards Georgetown University?
21     A.  It would have been right here (indicating).
22     Q.  Did Jarrod Patten say anything to you before

Page 67

1  he grabbed your arm?
2     A.  If he did I didn't hear him so I don't know.
3     Q.  Did you say anything to him?
4     A.  No.
5     Q.  At any point did you see Greg Davis, Mike
6  Hill and/or Casey Patten?
7     A.  When?
8     Q.  You step out onto the sidewalk.  You say that
9  Jarrod Patten grabbed your arm.  At this point do you
10  know where or do you see where Mike Hill, Greg Davis or
11  Casey Patten are?
12     A.  I didn't have time to look.
13     Q.  I don't know whether you did or not.  Did you
14  see them or didn't you?
15     A.  No.  Mr. Patten came at me too fast to
16  observe what was going on.
17     Q.  Can you stand up and demonstrate how your
18  hands were positioned before Mr. Patten grabbed your
19  arm?
20     A.  (Witness complies).
21     MR. McCOOL:  Let the record reflect that
22  Mr. Bassi has his arms extended not quite straight out

Page 68

1  and that his palms are facing straight in front of him
2  away from his body.
3  BY MR. McCOOL:
4     Q.  When you stepped out of the entrance did
5  Jarrod Patten approach you and meet you, according to
6  your recollection, or did you make it all the way out
7  onto the sidewalk and he then approached you to grab
8  your arm?
9     A.  I might have stepped maybe a step and a half
10  out, maybe a little more.
11     Q.  I'm going to ask Mr. Coburn to step around
12  and I want you to take his arm in the direction that
13  you said Mr. Patten did that morning.  Of course, I
14  want you to just take it far enough back so that we can
15  see the direction.  I don't want you to cause him any
16  pain.
17     A.  He comes this way (indicating).
18     MR. McCOOL:  Let the record reflect that
19  Mr. Bassi has positioned Mr. Coburn's right arm
20  straight back but alongside his body, not behind his
21  back.
22  BY MR. McCOOL:

Page 69

1     Q.  Is that fair to say, Mr. Bassi?
2     A.  I don't understand.
3     Q.  Perhaps someone else can help me describe it.
4  Mr. Coburn's arm was straight back.  It wasn't behind
5  his back or to the side?
6     A.  (Indicating).
7     Q.  Do you agree with that characterization?
8     A.  As opposed to wrapped behind my body?
9     Q.  Yes.
10     A.  Yes.
11     Q.  Do you allege that Mr. Patten continued to
12  pull or twist or manipulate your arm in some way after
13  he did what you just described with Mr. Coburn?
14     A.  No.
15     Q.  How far up did he pull your arm, according to
16  you?
17     A.  I don't know exactly how far he pulled it
18  behind me.
19     Q.  What did you do after Mr. Patten grabbed your
20  arm in the manner that you've described here today?
21     A.  After he wrenched my arm up behind my back, I
22  spun with the blow of it.  I'm then facing down

## Capital Reporting Company

| Page 70 |
|---|
| 1   O Street towards Wisconsin. The pain was so intense it |
| 2   took me a second to kind of gather myself. By the time |
| 3   I gathered myself, Casey had then charged towards me at |
| 4   which point I took Casey down to the ground. |
| 5      Q. Let me ask Mr. Coburn to step up again and if |
| 6   you could demonstrate how you took Casey Patten to the |
| 7   ground that morning. |
| 8      A. I have been spun around and he's coming at |
| 9   me. |
| 10     Q. You're still facing Wisconsin Avenue when |
| 11   you're standing on O Street? |
| 12       MR. MITCHELL: Make the wall behind |
| 13   Mr. Coburn Wisconsin Avenue. |
| 14       THE WITNESS: So I spun around, you're coming |
| 15   at me and I take you this way. |
| 16   BY MR. McCOOL: |
| 17      Q. Did you grab his shirt or grab his clothing? |
| 18      A. I would have grabbed around his shoulder |
| 19   area. |
| 20      Q. You made a grabbing motion and, for the |
| 21   record, twisted your body to the right in a motion that |
| 22   you would take Casey Patten to the ground; is that a |

| Page 71 |
|---|
| 1   fair description of what you just did with Mr. Coburn? |
| 2      A. Grabbed him by his shoulder and twisted -- |
| 3      Q. I'm going to get to that. Let me step back |
| 4   and start again. You've described grabbing Casey |
| 5   Patten in some way twisting your body towards the right |
| 6   and taking Casey Patten down to the ground; is that a |
| 7   fair characterization of what you just demonstrated |
| 8   with Mr. Coburn? |
| 9      A. I would say I used his momentum to take him |
| 10   down. I wasn't grabbing him down and throwing him |
| 11   down. |
| 12      Q. Did Casey Patten land on his back or his |
| 13   side? |
| 14      A. Flat on his back. |
| 15      Q. Let's back up a bit. Did you grab clothing |
| 16   or did you grab a part of his body, Casey Patten? |
| 17      A. I don't remember. |
| 18      Q. Did you grab him with both hands? |
| 19      A. I would have touched him with both hands but |
| 20   most of the direction would have been with my left. |
| 21      Q. As you were taking Casey Patten to the ground |
| 22   where was Jarrod Patten? |

| Page 72 |
|---|
| 1      A. I don't know. |
| 2      Q. During this time did he punch you? |
| 3      A. No. |
| 4      Q. Did he hit you in any way? |
| 5       MR. MITCHELL: Who are we talking about? |
| 6       MR. McCOOL: Jarrod Patten. |
| 7   BY MR. McCOOL: |
| 8      Q. As you were taking Casey Patten to the ground |
| 9   did Mr. Jarrod Patten strike you in any way as you were |
| 10   doing that? |
| 11      A. After I had taken Casey to the ground? |
| 12      Q. As you were taking him down to the ground or |
| 13   after you took him to the ground. |
| 14      A. No. |
| 15      Q. Did he say anything to you as you were taking |
| 16   Casey Patten to the ground? |
| 17      A. I don't know if he did. |
| 18      Q. You don't recall? |
| 19      A. No. |
| 20      Q. Where was Greg Davis as you were taking Casey |
| 21   Patten to the ground? |
| 22      A. I don't know. |

| Page 73 |
|---|
| 1      Q. Where was Mike Hill as you were taking Casey |
| 2   Patten to the ground? |
| 3      A. I don't know. |
| 4      Q. Where was Jay as you were taking Casey Patten |
| 5   to the ground? |
| 6      A. I don't know. |
| 7      Q. Where was Hanna Freeman as you were taking |
| 8   Casey Patten to the ground? |
| 9      A. I don't know. |
| 10     Q. What happened after you took Casey Patten to |
| 11   the ground? |
| 12      A. My butt was facing towards Wisconsin Avenue |
| 13   and I am parallel -- |
| 14      Q. To O Street? |
| 15      A. Yes. I'm on top of him crisscross and I am |
| 16   restraining him holding him down. |
| 17      Q. Did Casey Patten resist you in any way? |
| 18      A. Yes. |
| 19      Q. How did he resist you? What did he do? |
| 20      A. He tried to punch at me but because I was on |
| 21   top of him he couldn't really punch. He then tried to |
| 22   grab at my jacket and try to pull and resist. |

# Capital Reporting Company

Page 74

1    Q.  Was he successful?
2    A.  No.  I told him if he just gave up that I was
3  going to let him up.
4    Q.  So what happened?
5    A.  So after a few more attempts to struggle, he
6  then kind of just relaxed and I proceeded to stand up
7  off of him.
8    Q.  Did there come a time when you saw Mike Hill
9  again that evening?
10    A.  Yes.
11    Q.  Did there come a time when you saw Greg Davis
12  again that evening?
13    A.  Yes.
14    Q.  If my understanding of your testimony is
15  correct, you didn't know where they were when you took
16  Casey Patten down to the ground, correct?
17    A.  Correct.
18    Q.  Did you know where they were when you were
19  restraining him on the ground?
20    A.  No.
21    Q.  When did you next see them after that?
22    A.  After I come up from the bar.

Page 75

1    Q.  So sometime later?
2    A.  Yes.
3    Q.  Tell me, there came a time when you let Casey
4  Patten up off the ground?
5    A.  Yes.
6    Q.  Where did you go after that?
7    A.  After I released Casey I stood up and
8  proceeded to go straight down to the bar and to find
9  Bo.
10    Q.  Did you see Jarrod Patten at all during this
11  time frame?
12    A.  No.
13    Q.  Did you eventually come into contact with Bo
14  Blair?
15    A.  Yes.
16    Q.  How did you contact him, in person or did you
17  call him or how did you reach him when you went back
18  inside the O Street entrance?
19    A.  In person.
20    Q.  Where did you reach him?
21    A.  In the bar.
22    Q.  Where was he inside the bar when you

Page 76

1  approached him?
2    A.  Standing at the DJ booth.
3    Q.  Do you remember anyone standing with him or
4  near him as you approached him?
5    A.  Yes.
6    Q.  Do you recall Andrew Taylor being there?
7    A.  I don't recall who that is.
8    Q.  Do you recall Winston Lord being there.
9    A.  No.
10    Q.  Did you see Jay as you went back inside the
11  O Street entrance to get Bo?
12    A.  I don't know.
13    Q.  You don't recall?
14    A.  I don't know where he was.  I don't remember
15  seeing him.
16    Q.  What did you say to Bo when you went inside?
17    A.  I said, "Bo, I need you right now."
18    Q.  What happened next?
19    A.  He came.  He led the way back up to the
20  O Street entrance.
21    Q.  Who did he lead, just you or anyone else?
22    A.  I don't know.  I was behind him.  There was

Page 77

1  like 100 people in the bar that were all around the DJ
2  booth.  There was people out in the courtyard.
3    Q.  Do you mean the bottom of the steps inside
4  the O Street entrance, is that the courtyard you're
5  referring to?
6    A.  Yes.
7    Q.  Where did Bo go after you alerted him that
8  there was something going on?  You said he led you up
9  towards O Street.  Where did he go and what did you
10  see?
11    A.  He went up the stairs to the walkway and
12  right to the O Street door to the street.
13    Q.  Did you follow him?
14    A.  Yes.
15    Q.  Did you remain inside the O Street entrance
16  or did you go out onto the sidewalk?
17    A.  Remain in the entrance.
18    Q.  Did you look outside to see what was going
19  on?
20    A.  Yes.
21    Q.  What did you see and hear, as well?
22    A.  When I got up there, it looked like the fight

# Capital Reporting Company

Page 78

1    had kind of died down. There were door guys on one
2    side and it looked like the Patten's kind of were
3    separated from each other. I don't recall whether or
4    not Casey and Jarrod were next to each other, but I do
5    recall Jarrod screaming at Bo.
6        Q. What do you recall hearing him say?
7        A. I don't recall.
8        Q. After you took Casey Patten to the ground
9    were you able to raise your right arm?
10       A. Yes.
11       Q. How far were you able to raise it? Did you
12   try to raise it over your head?
13       A. No, I did not try to raise it over my head.
14       Q. Did you feel pain at that point?
15       A. Yes.
16       Q. How would you describe it on a scale of zero
17   to ten?
18       A. When?
19       Q. After you took Casey Patten to the ground and
20   got up.
21       A. Less painful than when Jarrod ripped it
22   behind me.

Page 79

1        Q. So the pain had decreased somewhat at that
2    point?
3        A. Well, yes, there was a very intense feeling
4    of pain when it subluxed, at which point I was focused
5    on the shoulder. Once Casey came at me, you know, I
6    wasn't paying attention to the pain. I didn't have a
7    choice.
8        Q. When you had Casey Patten down on the ground
9    did you punch him?
10       A. No.
11       Q. Did you kick him?
12       A. No.
13       Q. Did you hit him in any way?
14       A. No.
15       Q. Did you see anyone else punch, kick, strike
16   or otherwise hit Casey Patten on the morning of January
17   14th?
18       A. While I was holding him on the ground?
19       Q. I said on the morning of January 14th, did
20   you see anyone punch, kick, strike or otherwise hit
21   him?
22       A. No.

Page 80

1        Q. At any point did you punch, kick, strike or
2    otherwise hit Jarrod Patten?
3        A. No.
4        Q. Did you observe anyone else on the morning of
5    January 14th grab, punch, kick, strike or otherwise hit
6    Jarrod Patten?
7        A. I think I already alluded to that in a
8    previous question.
9        Q. Just answer the question.
10       A. Grab, yes.
11       Q. Who did you see grab him?
12       A. Greg Davis.
13       Q. When did you see Greg Davis grab him?
14       A. After I had come up with Bo.
15       Q. So you came up and you saw Jarrod Patten was
16   screaming at Bo?
17       A. Yes.
18       Q. What happened after you saw that?
19       A. The fight seemed like it was going to die and
20   they separated and Casey Patten then tried to attack
21   one of the other door guys, Jay.
22       Q. While you were standing there?

Page 81

1        A. Yes.
2        Q. Could you describe that in more detail,
3    please.
4        A. He swung at him. He was on the right and Jay
5    was on the left.
6        Q. Did Jay say anything before Casey tried to
7    attack him?
8        A. I don't know.
9        Q. You don't recall?
10       A. I don't know if he said anything or not.
11       Q. You didn't hear him say anything?
12       A. Correct.
13       Q. What did you see Jay do before Casey tried to
14   attack him?
15       A. Nothing.
16       Q. Was Casey successful in attacking Jay?
17       A. I don't know.
18       Q. Why not?
19       A. Because I don't know if he landed a punch or
20   not.
21       Q. You saw him throw the punch?
22       A. Yes.

## Capital Reporting Company

22 (Pages 82 to 85)

Page 82

1   Q.  Did you see the punch land?
2   A.  No.
3   Q.  Why is that?  Is that a failure of
4   recollection or your view was obstructed?
5   A.  View was obstructed.
6   Q.  By what or whom?
7   A.  By the numerous people that were up there.
8   Bo and Jay moved so I don't know.
9   Q.  Where was Mike Hill at this point?
10  A.  I don't know.
11  Q.  Where was Greg Davis?
12  A.  I can't recall.
13  Q.  What happened after you saw Casey try to
14  attack Jay?
15  A.  Greg grabbed both of the Patten's and held
16  them up against the wall.
17  Q.  Greg did by himself?
18  A.  Yes.
19  Q.  How tall is Greg?
20  A.  I don't know.  Taller than me.
21  Q.  How tall are you?
22  A.  6 feet.

Page 83

1   Q.  How much does he weigh, about?
2   A.  I couldn't tell you.  I don't know.
3   Q.  More than you?
4   A.  Yes.
5   Q.  How much do you weigh?
6   A.  185.
7   Q.  How much did you weigh on January 14th?
8   A.  187.
9   Q.  Is he much larger than you or slightly larger
10  than you?
11  A.  He is larger than me.
12  Q.  Strong guy?
13  A.  I guess.
14  Q.  Did you ever lift with him?
15  A.  A few times.
16  Q.  All right.  How strong was he?  How much did
17  he bench press?
18  A.  We didn't bench.
19  Q.  What sort of lift exercises did you do with
20  Greg Davis?
21  A.  I never lifted per se with him one-on-one.
22  We've gone to the gym together.  I wouldn't consider

Page 84

1   him a lifting buddy.  He was at that part of the gym
2   and I was at that part of the gym.
3   Q.  How do you know Greg Davis?
4   A.  Went to high school with him.  He went to
5   Georgetown Prep and he then went to Georgetown.  I know
6   his cousin very well.
7   Q.  Who is that?
8   A.  Nicholas Veith.
9   Q.  How do you spell his last name?
10  A.  V-E-I-T-H.
11  Q.  Did you graduate the same year as Greg Davis?
12  A.  No.
13  Q.  When did Greg Davis graduate?
14  A.  The year ahead of me.
15  Q.  When did you graduate from Georgetown Prep,
16  what year?
17  A.  2004.
18  Q.  Did you socialize with Greg Davis while you
19  were at Georgetown Prep?
20  A.  No.
21  Q.  Did you socialize with Greg Davis while you
22  were at Georgetown University?

Page 85

1   A.  Yes.
2   Q.  How often?
3   A.  Not very often.
4   Q.  Would you describe him as a close friend?
5   A.  No.
6   Q.  How do you know Mike Hill?
7   A.  He is a coach at Georgetown.
8   Q.  What does he coach?
9   A.  He is a strength coach and conditioning coach
10  for athletic teams, men and women.
11  Q.  How old is Mike Hill?
12  A.  I don't know.
13  Q.  Is he older than you?
14  A.  Yes.
15  Q.  Does he appear to be in his 20s, 30s, 40s?
16  A.  20s.
17  Q.  Did he attend Georgetown University?
18  A.  No.
19  Q.  Do you know where he went to school?
20  A.  I believe Iowa but I could be wrong.
21  Q.  Do you socialize with Mike Hill?
22  A.  No.

## Capital Reporting Company

Page 190

1          CERTIFICATE OF NOTARY PUBLIC

2      I, Jacqueline Schultes, Registered Professional

3   Reporter and Certified Realtime Reporter, the officer

4   before whom the foregoing deposition was taken, do

5   hereby certify that the witness whose testimony appears

6   in the foregoing deposition was duly sworn by me; that

7   the testimony of said witness was taken by me in

8   stenotype and thereafter reduced to typewriting under

9   my direction; that said deposition is a true record of

10   the testimony given by said witness; that I am neither

11   counsel for, related to, nor employed by and of the

12   parties to the action in which this deposition was

13   taken; and, further, that I am not a relative or

14   employee of any counsel or attorney employed by the

15   parties hereto, nor financially or otherwise interested

16   in the outcome of this action.

17

18          JACQUELINE SCHULTES

19              Notary Public in and for the

20          Commonwealth of The District of Columbia

21   My commission expires:

22   February 29, 2012

Page 1

IN THE U.S. DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

------------------------------x

NEILL BASSI,                    :       COPY

         Plaintiff,             :

v.                              :    Case No.:

JARROD AND CASEY PATTEN         :    07-1277

         Defendants.            :

------------------------------x

                    Washington, D.C.

               Tuesday, April 15, 2008

Deposition of:

                    MICHAEL HILL

    called for examination by counsel for Defendant,

pursuant to notice, at Georgetown University, Yates

Field House, Washington, D.C., before Patricia A.

Edwards of Capital Reporting, a Notary Public in and

for the District of Columbia, beginning at 10:06 a.m.,

when were present on behalf of the respective parties:

## Capital Reporting Company

Page 22

1    Q    What time did you arrive?

2    A    The door guys get there at 10:30.

3    Q    So around that time?

4    A    Yeah, right around that time. Yup.

5    Q    Did you have anything to drink that night,

6    alcohol?

7    A    No.

8    Q    All right. What other door guys were

9    working there that night?

10   A    I know Neill was, Greg Davis, Jay is the

11   side door guy, and I believe that was it.

12   Q    Okay. How long have you known Greg Davis?

13   A    I knew -- right when I first -- when I first

14   got here, he was -- four years ago, he was a football

15   athlete at Georgetown, and then I only knew him for

16   about maybe five months or so, just when I first got

17   here. So I really didnt -- I mean I never spoke to him

18   then.

19   Q    Uh-huh.

20   A    I just knew him as an athlete and then he

21   had quit football, so --

22   Q    Why did he quit football?

Page 23

1    A    He had an ankle injury, I believe, and I

2    hadnt spoken to him until -- I didnt even -- the name

3    didnt even ring a bell when I was working that first

4    night.

5    Q    Does he still work at Smith Point?

6    A    No. I believe he lives in Philadelphia.

7    Q    Do you socialize with Greg Davis at all?

8    A    No. Uh-uh. Other than, you know, when we

9    worked together. That was it.

10   Q    You guys never went out and had a beer

11   together?

12   A    Nope.

13   Q    Lunch?

14   A    Nope.

15   Q    Do you know whether or not Neill Bassi, Greg

16   Davis, or Jay, had any alcohol to drink that night?

17   A    I wouldnt think so. I mean were definitely

18   not allowed to do that. I mean you would just get

19   fired if Bo either suspects, or smells, or whatever.

20   Q    How many entrances are there to Smith Point?

21   A    Theres only two. So theres a Wisconsin

22   entrance and then theres an O entrance.

Page 24

1    Q    What entrance were you working at that

2    evening?

3    A    The O Street entrance. Jay works around the

4    corner.

5    Q    Describe the O Street entrance? If someone

6    had never seen the O Street entrance to Smith Point,

7    how would you describe it in words? Paint a picture

8    for me?

9    A    Kind of like a back alley, you know, just

10   not even like there was a bar there. Theres a door

11   that opens up and kind of like a New York style bar

12   with brick -- you know -- brick and vine on the street

13   corner.

14   Q    Let me show you -- these are a little dark.

15   I apologize. MH3, is that a fair and accurate picture

16   of how the O Street entrance appeared on the night of

17   January 13, 2007?

18   A    Yeah. Yeah. I mean theres a flower pot

19   right there and two doors.

20   Q    And theyre metal doors?

21   A    Yeah. Two metal doors.

22   Q    How was the O Street entrance set up? Were

Page 25

1    the doors open as the way they appear in MH3?

2    A    No. So this door (indicating) is shut.

3    Q    The door that is open in that photograph was

4    shut?

5    A    Yeah, its always -- this door is always shut

6    (indicating), because the guy with the money sits right

7    behind here (indicating). This door is the one that is

8    open (indicating).

9    Q    The door that is closed in that

10   photograph --

11   A    Yeah.

12   Q    -- was open?

13   A    Yup.

14   Q    What, if anything, was placed out in front

15   of the door that night?

16   A    There is -- so theres four -- right in

17   front, theres just four of those -- I dont know what

18   you would call them.

19   Q    Like metal stands?

20   A    Metal stands, yeah, with clips. So theres

21   four right out there and then theres three coming out

22   to create a line.

## Capital Reporting Company

Page 30

1  you MH3?
2      A   Yeah.
3      Q   He would sit inside the doorway?
4      A   Uh-huh.
5      Q   Was there a chair or a stool there that --
6      A   There was a chair and a table and all that.
7      Q   And a table as well?
8      A   Yeah.
9      Q   All right.
10     A   And then I was doing the ropes to start out
11 with, because thats kind of the new guy station. You
12 just do the ropes, and then Greg Davis who -- would
13 have been the veteran there, he would do the list, just
14 because he knows all the people that would come in
15 and --
16     Q   What would you do if you were working the
17 ropes; is that fair to say?
18     A   Uh-huh.
19     Q   What would you do?
20     A   Just let people in and let people out.
21     Q   Oh, okay.  So you would just -- pull the
22 blue or red rope, or whatever it is, and put it back

Page 31

1  on?
2      A   Very elementary.  Yeah.
3      Q   Gotcha.
4      A   Yeah.  Just making sure its not too many
5  people come in, you know.
6      Q   What time did you see Jarrod and Casey
7  Patten approach the O Street entrance?
8      A   Im definitely not sure about the exact time,
9  but I know all the ropes were down, which means that
10 the bar was closed after 2:00, and we were both, Neill
11 and I, were both up at the front door.  So that means
12 that Greg was downstairs, inside, and, you know, trying
13 to cattle people outside.  So I mean its anywhere, you
14 know, from 2:00 until whenever the 911 call was made.
15 Anywhere in there.
16     Q   Okay.  Where did -- where were you and Mr.
17 Bassi?  You said Greg was downstairs?
18     A   Yeah.
19     Q   And you said you were at the front door?
20     A   Yeah.
21     Q   Is that this O Street door?
22     A   Yeah.  I mean front door and side door.  I

Page 32

1  guess theres no real back.
2      Q   I just want to make sure were on the same
3  page?
4      A   Yeah.  So were just -- both of us were
5  standing, you know, right -- I mean I dont know where
6  exactly we were standing beforehand, but you stand
7  right there (indicating), and let people out and make
8  sure nobody has drinks, and people gather around here
9  (indicating) and try and get back in all the time.  So
10 theyre just standing right around here (indicating).
11 That's why there is two of us standing up there,
12 because, you know, if youre watching drinks, watching
13 people come in, people kind of slide right by.
14     Q   Why do they try to get in?
15     A   Neill -- I cant remember who was the first
16 one that talked to them, but I know that they were
17 trying --
18     Q   Lets just talk about Neill --
19     A   Jarrod and Casey Patten.  Were you talking
20 in general that people try to get back in?
21     Q   Yes.
22     A   So they try and get back in -- so when were

Page 33

1  watching people come through here (indicating), they
2  just try -- I mean people are coming in and coming out
3  in a big long line, and people will go in, and there
4  are so many people that are coming in and out, I mean
5  sometimes somebody will just dart right in, you know,
6  right passed you and youre trying to catch them while
7  more people are coming out with drinks.
8      Q   Is this after closing?
9      A   Yes, at 2:00, when everybody is, you know,
10 moving out.
11     Q   All right.  Was this -- something like this
12 taking place when Jarrod and Casey Patten arrived at
13 the O Street entrance?
14     A   There wasnt a whole lot of people coming in
15 and coming out right when they first came, but I know
16 as we were standing there, more people were behind us.
17 Yeah.
18     Q   All right.  Could you describe Jarrod Patten
19 physically?  How he physically appeared?
20     A   Yeah.  I was standing -- theres a little
21 ledge right here (indicating).
22     Q   All right.

## Capital Reporting Company

Page 34

1    A    I was standing off the ledge, and he was
2    standing on it. So he was definitely taller than me.
3    Definitely taller, bigger, dark complexion, black hair.
4    I could definitely pick him out of a line up. I know
5    that.
6    Q    All right. I didnt bring one with me.
7    A    Okay.
8    Q    What about Casey Patten, what does he like?
9    A    He was smaller. He had T shirt on, a black
10   T shirt.
11   Q    All right.
12   A    Smaller, short hair. Ive seen him before.
13   Well, I mean after that had happened, I saw him.
14   Q    Where did you see him?
15   A    I actually was sitting in his seats.
16   Winston gave me a pair of tickets to the Nationals
17   game, and I was actually sitting in the seats and he
18   had no idea who I was. So he was like, dont worry,
19   just sit, wherever. So I dont know.
20   Q    So you saw him at a Nationals game?
21   A    Yeah.
22   Q    You were sitting in his seats?

Page 35

1    A    Yeah. I just knew -- I mean I saw him right
2    away, but then I confirmed that -- because the girl
3    that he was with was calling him Casey and Patten. It
4    was kind of weird, but --
5    Q    Did you introduce yourself to him at the
6    Nationals game?
7    A    No, uh-uh. Because Winstons seats were
8    sitting in front and his seats were two seats behind
9    him, so, no.
10   Q    Did he say anything to you at any point --
11   A    No.
12   Q    -- to indicate that he recognized you?
13   A    Had no idea who I was. Well, I mean maybe.
14   Q    You didnt ask him whether or not?
15   A    Yeah. I didnt ask him, but, yeah.
16   Q    Did anyone else come to you and say, hey,
17   Casey Patten and I were talking? He saw you at the --
18   A    No.
19   Q    He had no idea you were at the Nationals
20   game?
21   A    Nope. I was by myself. No.
22   Q    When was this Nationals game, this year or

Page 36

1    last year?
2    A    It would have been this past summer. Yeah.
3    I have the actual tickets at home.
4    Q    It was not at the new -- it was at RFK?
5    A    No, it was in RFK. Yeah.
6    Q    All right.
7    A    I believe it was a Mets game. Yeah.
8    Q    Other than seeing Casey Patten at the
9    Nationals game, had you seen either Casey and Jarrod
10   Patten on any other -- at any other time other than
11   this night of January 13?
12   A    No.
13   Q    Earlier when you said you spoke with Eric,
14   were you referring to Eric Mitchell, the attorney
15   sitting to your left?
16   A    Yes.
17   Q    When did you first meet Mr. Mitchell?
18   A    Im actually not sure about the date, but I
19   mean it was a while ago. Yeah. He had contacted me at
20   Georgetown.
21   Q    By telephone?
22   A    Yes.

Page 37

1    Q    Did you speak with him by phone?
2    A    No. He came to Georgetown actually.
3    Q    You all met in person?
4    A    Yup.
5    Q    All right. Was he alone or with anyone
6    else?
7    A    By myself.
8    Q    All right. Did he ask you questions about
9    what happened?
10   A    Yeah. Just general, I mean same exact
11   questions.
12   Q    Did -- not word for word?
13   A    Well, not word for word, yeah.
14   Q    Was he taking notes?
15   A    Yeah. Just I mean not a whole lot of notes,
16   just, you know, just kind of cliff notes I guess.
17   Q    Did he ask you to sign a statement?
18   A    No.
19   Q    Did he ask you to write anything out?
20   A    No.
21   Q    Did he ask you to speak into a tape recorder
22   or anything like that?

## Capital Reporting Company

Page 38

1    A    Nope.
2    Q    All right. How many times total have you
3    met with Mr. Mitchell?
4    A    Just twice.
5    Q    When was the other time you met?
6    A    I cant remember the exact date on either one
7    of them. I guess I would have it in my Outlook.
8    Q    How close in time were they?
9    A    I mean, I have no idea.
10   Q    Well --
11   A    Id say a couple of months.
12   Q    Why did you meet with him the second time,
13   do you know?
14   A    I guess just to, you know, clear up some
15   things. I mean I dont know.
16   Q    All right. Lets go back to the night of
17   January 13, 2007. You said you and Mr. Bassi were
18   somewhere near the O Street entrance in the doorway
19   there. How many other people were present when Jarrod
20   Patten and Casey Patten came up?
21   A    Came up -- I dont know the people, you know,
22   behind us, you know, the exact people, but I mean it

Page 39

1    was definitely -- Jarrod and Casey were there. Neill
2    and I were there, and there was also a girl, who I
3    later found out her name, Hannah Freeman, was standing
4    there and she had I believe had one other friend. I
5    dont know her name, was up there with them. So that
6    was -- I mean thats it. Other than that, whoever was
7    behind us -- was behind us.
8    Q    What happened when they approached? Just
9    tell me and Im going to try to not interrupt you. Just
10   tell me who said what, if anything? Who did what, if
11   anything? So walk me through it?
12   A    So they both came up to the door and Jarrod
13   was in the front and Casey was behind. But I mean
14   theyre like, obviously, can we get in to the bar, you
15   know, were trying to meet a friend, and you all know.
16   We said, no, the bar is closed, and they gave the
17   normal response of, well, we know Bo, and I believe
18   they said, we know Winston, were trying to get Winston.
19   And its, you know, the same response, sorry, youre
20   going to have to give him a call. You know, whatnot,
21   and I believe it was both Neill and I were both talking
22   to them.

Page 40

1    And then at some point, Neill had stepped
2    behind me and I was in front, and Hannah Freeman was
3    right next to me. So as Im, you know, saying, no, you
4    cant come in, and I remember Jarrod saying, I run this
5    city and I can come in. And I was like, well, no,
6    sorry, you dont, you know, and then out of nowhere, I
7    get hit right in my cheek, and it was Casey had jumped
8    over his brother and punched me (indicating).
9        MR. COBURN: Let the record reflect a motion
10   to your right lower cheek.
11       THE WITNESS: Yeah. Then after that, you
12   know, Neill had said, this guy just hit Mike. You
13   know, I had stood right there and I didnt move. Jarrod
14   was standing right there, right in my way. So after
15   that, I said step inside. I mean, you know, it didnt
16   -- he hit me, but it wasnt like I had gotten knocked
17   dizzy or unconscious or anything, and I was telling him
18   to step inside, step inside.
19   BY MR. MCCOOL:
20   Q    Wait. Who were you telling to step inside?
21   A    For Casey to -- I mean just walk and step
22   inside.

Page 41

1    Q    Step inside where?
2    A    Inside these doors (indicating).
3    Q    You wanted Casey, the guy who hit you, to
4    step inside?
5    A    Yeah. Because thats -- I mean if somebody
6    hits you, you grab them, take them. I mean obviously
7    arrest them, you know. So I had told him to step
8    inside, and he was jumping around out here (indicating)
9    and I don't know what he was doing. But jumping
10   around, you know, yelling, and I remember Casey -- I
11   remember telling Jarrod, I dont have a problem -- I was
12   like, I dont have a problem with you. You can do
13   whatever you want. Those were the exact words I told
14   him.
15   Q    What did he say when you said that?
16   A    He was like, this is my brother, you know,
17   just standing right in front of me. Well, as I was
18   saying that, the girl next to me, Hannah, was kind of,
19   you know, motioning step inside as well. And I
20   remember, I looked down for a split second, and I
21   looked back up and Casey hit me again right in my nose.
22   And at that point, I was kind of taken back a little

# Capital Reporting Company

12 (Pages 42 to 45)

Page 42

1  bit from him hitting me in the nose, and I came through
2  -- I pushed through Jarrod right here (indicating). It
3  would be Jarrods left shoulder, I guess, and went
4  toward Casey out on the street. So went to the street
5  and was basically -- he grabbed my shirt. I grabbed
6  his shirt and it was just us pulling, I mean, kind of
7  like a grappling, I guess.
8       Then he had fallen over. He had fallen over
9  on the ground, and I had turned around. I didnt know
10 who else was with these guys. I mean there was two of
11 them, but there was tons of people out here.
12      Q   Oh, there was tons of people out on the
13 street?
14      A   I mean just random. I cant say -- I dont
15 know how many exact people, but random people all over,
16 and so after he had fallen to the ground, I kind of
17 went out into the street, and just -- I mean I was --
18      Q   In the street or on the sidewalk?
19      A   Just on the -- I would be -- let me see a
20 picture. It would be just right up here (indicating),
21 kind of by this tree over here (indicating).
22      Q   Okay. All right. On the sidewalk of O

Page 43

1  Street?
2       A   Yeah.
3       Q   Toward Wisconsin?
4       A   I mean, yeah, I didnt rage out into the
5  street.
6           MR. MITCHELL: Which exhibit are you looking
7  at?
8           MR. MCCOOL: Ill give them to them shortly.
9  BY MR. MCCOOL:
10      Q   MH1 is where youre pointing at?
11      A   Yeah.
12      Q   Okay, go ahead. Continue?
13      A   So after -- you know, I was kind of taken
14 back by the nose hit, and I walked -- gotten out
15 here (indicating) and turned around, and by that time,
16 I had turned around, I had saw Casey was on the ground
17 and Neill had him on the ground, just holding him
18 on the ground. And then to my left -- so I had gone
19 out I guess, reverse MH3. Yeah, I had kind of gone out
20 the door, kind of tussled with Casey, and then gone out
21 to the right.
22      Q   Towards Wisconsin?

Page 44

1       A   Yeah. Towards Wisconsin Street. Yeah, like
2  curved out, whatever. And when I turned around and
3  looked, and just as I was looking at -- Casey would be
4  over here on the ground (indicating), with Neill and
5  then Jarrod was up against this wall over here
6  (indicating), and Greg Davis, and I believe -- there
7  was probably four or five people around him.
8       Q   Around Jarrod?
9       A   Yes.
10      Q   Did you see how Neill Bassi got to the point
11 where he was holding Casey down?
12      A   No, I did not.
13      Q   After Casey Patten fell to the ground, did
14 he get back up? Did you see him get back up?
15      A   Well, after I was holding onto him and he
16 was jumping around, he had fallen to the ground.
17      Q   Thats right.
18      A   And so I had kind of moved, and I had turned
19 completely around, and he was -- he had already had
20 him. So he fell to the ground, and he -- I mean he may
21 have not even stood up.
22      Q   Thats what Im trying to find out. Did you

Page 45

1  see Casey Patten get up after he fell to the ground?
2       A   No, I did not, to be honest. So Neill could
3  have just, you know, laid on him. He could have picked
4  him up and body slammed him. I mean, I dont know. I
5  mean, I had turned completely around and just saw both
6  of those guys.
7       Q   When -- and let me show you -- did you see
8  the point where on MH1 where Casey Patten was on the
9  ground and can you put, CP, there?
10      A   Yeah. So he was right here in front of that
11 (indicating).
12      Q   Is that the point where he fell?
13      A   He probably --
14      Q   Well, think now. He fell to the ground;
15 right?
16      A   Uh-huh.
17      Q   And then you turned and you saw Neill Bassi
18 on top of him?
19      A   Yeah. I mean --
20      Q   Was he in the same location?
21      A   Yeah. Just right in this general area
22 (indicating), right there.

**Capital Reporting Company**

Page 100

1                CERTIFICATE OF NOTARY PUBLIC

2         I, PATRICIA A. EDWARDS, the officer before whom

3    the foregoing deposition was taken, do hereby certify

4    that the testimony that appears in the foregoing pages

5    was recorded by me and thereafter reduced to

6    typewriting under my direction; that said deposition is

7    a true record of the proceedings; that I am neither

8    counsel for, related to, nor employed by and of the

9    parties to the action in which this testimony was

10   taken; and further, that I am not a relative or

11   employee of any counsel or attorney employed by the

12   parties hereto, nor financially or otherwise interested

13   in the outcome of this action.

14

15

16                  PATRICIA A. EDWARDS

17              Notary Public in and for the

18                 District of Columbia

19

20

21   My commission expires:

22   January 1, 2010

1

```
 1
 2              UNITED STATES DISTRICT COURT
 3             FOR THE DISTRICT OF COLUMBIA
 4                    CIVIL DIVISION
 5    - - - - - - - - - - - - - - - x
      NEILL S. BASSI                 )
 6    Plaintiff/Counter-Defendant    )
          vs.                        )
 7    JARROD M. PATTEN               )
      Defendant                      )
 8    and                            )
      CASEY T. PATTEN                )
 9    Defendant/Counter-Plaintiff    )
      _____    )
10    JARROD M. PATTEN               )
      Defendant/                     )
11    Third-Party Plaintiff          )
      and                            )
12    CASEY T. PATTEN                )
      Defendant/Counter-Plaintiff/   )
13    Third-Party Plaintiff          )
          vs.                        )
14    GREG DAVIS                     )
      Third-Party Defendant          )
15    - - - - - - - - - - - - - - - x
16         Deposition of Robert K. Blair
17               Washington, D.C.
18          Monday, February 11, 2008
19                  11:02 a.m.
20    Job No.  121975
21    Pages:  1-188
22    Reported by:  Bonnie Russo
```

ORIGINAL


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

Case 1:07-cv-01277-JDB    Document 38-5    Filed 04/11/2008    Page 2 of 7
DEPOSITION OF ROBERT K. BLAIR
CONDUCTED ON MONDAY, FEBRUARY 11, 2008

2 (Pages 5 to 8)

---

**5**

1        P R O C E E D I N G S
2    ROBERT K. BLAIR,
3    having been duly sworn, testified as follows:
4        EXAMINATION BY COUNSEL FOR PLAINTIFF
5            NEILL S. BASSI:
6        BY MR. MITCHELL:
7        Q.    Could you please state your full
8    name for the record.
9        A.    Robert King Blair.
10       Q.    Mr. Blair, let me tell you who I am.
11   My name is Eric Mitchell.  I represent the
12   plaintiff in this lawsuit, Neill Bassi.  Mr.
13   Bassi has sued Jarrod Patten and Casey Patten.
14   I have asked you to come here today to ask you
15   some questions about the facts giving rise to
16   this lawsuit.
17           Do you understand that?
18       A.    Yes.
19       Q.    There are a couple of guidelines to
20   follow in this deposition process.  One is
21   this:  If you don't understand the question
22   that I ask, just let me know and I will try to

---

**6**

1    rephrase the question in a manner you
2    understand.  Is that fair?
3        A.    Yes.
4        Q.    A second rule that I want to remind
5    you of, in part, because you nodded during my
6    questions is that -- or my statement is that
7    when you answer a question I need you to answer
8    with an articulated answer as opposed to a nod
9    or a word such as uh-huh or something like
10   that.
11           Do you understand that?
12       A.    Yes.
13       Q.    All right.  Have you ever been
14   deposed before?
15       A.    I don't think so.  No.
16       Q.    Okay.  Are you under the influence
17   of any drugs or alcohol today?
18       A.    No.
19       Q.    Are you under the influence of any
20   medications?
21       A.    No.
22       Q.    Is there any reason why you can't

---

**7**

1    give full and complete testimony today?
2        A.    No.
3        Q.    This is not a stamina test, if you
4    need a break just let me know and we'll take a
5    break.  Everyone will probably appreciate that
6    as well.
7            Is that understood?
8        A.    Yes.
9        Q.    Okay.  Good.
10           Now, could you just give your --
11   give me your home address, please?
12       A.    3227 45th Street, Washington, D.C.
13   20016.
14       Q.    Okay.  Mr. Blair, how are you
15   employed?
16       A.    I am self-employed.
17       Q.    What do you do in your
18   self-employment?
19       A.    I own a few different businesses.
20       Q.    Okay.  Do you own a place called
21   Smith Point?
22       A.    Yes.

---

**8**

1        Q.    Now, were you at Smith Point on the
2    evening of January the 13 and 14th, 2007?
3        A.    Yes.
4        Q.    What time did Smith Point open for
5    business that evening?
6        A.    6:30.
7        Q.    Is that what time Smith Point
8    typically opens on a Saturday night?
9        A.    Yes.
10       Q.    And at 6:30 who among your employees
11   are there when it opens?
12       A.    My manager, some wait staff, kitchen
13   staff.  It's about it.
14       Q.    Were you there at Smith Point that
15   day, January 13th, 2007?
16       A.    Yes.
17       Q.    Do you recall what time you arrived
18   at work that Saturday?
19       A.    Probably around -- I always get
20   there about 10:30.
21       Q.    Are you familiar with the term "door
22   guys"?

---

9

1   A.   Yes.
2   Q.   What does that mean in Smith Point
3   parlance?
4   A.   People that I hire to, you know,
5   check IDs, to help me with crowd control, to
6   deal with patrons coming in and coming out.
7   Q.   Okay.  And how many door guys did
8   Smith Point employ in January of 2007?
9   A.   In total or that night?
10   Q.   That night.
11   A.   I think we had a total of four that
12   night.
13   Q.   Okay.  And who were the Smith -- I'm
14   sorry.  Strike that.
15       Who were the door guys on duty that
16   night?
17   A.   It might have been three, actually.
18   I mean, I just -- I think it was actually three
19   that night.
20   Q.   And what individuals are you talking
21   about?
22   A.   I have one -- I have one guy I call

10

1   door guy that basically just stands at another
2   entrance to Smith Point that isn't really a
3   door guy.  He's kind of like just making sure
4   nobody comes in and out of that door.  So -- I
5   mean, that's what a -- when I said four I was
6   counting him as the fourth.
7   Q.   Okay.
8   A.   The three people that were on O
9   Street were -- that night, were Michael Hill,
10   Neill Bassi and Greg Davis.
11   Q.   Now, what time was Smith Point
12   supposed to close that Saturday night?
13   A.   We have a very strict policy that we
14   don't let anyone in after 2 a.m..
15   Q.   Now, on that particular evening,
16   were you occupied as the owner of Smith Point
17   inside the establishment the whole time?
18   A.   What do you mean the whole time?
19   Q.   Well, let's talk about during the
20   normal eating hours.  Were you basically inside
21   Smith Point?
22   A.   Yeah.  I'm generally inside, yes.

11

1   Q.   What are you doing during that
2   normal business hours?
3   A.   You know, taking -- I'm talking to
4   patrons, making sure everything is going right,
5   general running of operations.
6   Q.   Okay.  And is there -- at a
7   particular hour, do your door guys get
8   stationed at the O Street entrance during a
9   typical Saturday night?
10   A.   Yes.  About 11:00 we have the O
11   Street entrance opened.
12   Q.   Okay.  And it is closed until about
13   that hour?
14   A.   Yes.
15   Q.   Now -- and at that hour, what do the
16   door guys do at 11:00 when they go to the O
17   Street entrance?
18   A.   We go to the O Street entrance, we
19   open, we set up stations around the entrance
20   and, you know, around the entrance, the door
21   entrance.
22   Q.   All right.  Let me remind you, and I

12

1   didn't state this initially, which is my fault.
2   Try to let me finish the question before you
3   respond because I think you can anticipate the
4   answer and you begin speaking while I'm
5   speaking.  So for the reporter's sake, let me
6   finish my question before you begin your
7   answer.
8   A.   Okay.
9   Q.   Now, do you typically, as the owner
10   of Smith Point, assist the door guys in the
11   preparation of the O Street entrance being made
12   open?
13   A.   Not really.  They pretty -- it's
14   pretty much a simple procedure.
15   Q.   And is it fair to say that the guys
16   who have done it before know how to do it, that
17   is, open up the O Street entrance?
18   A.   Yes.
19   Q.   Now, did there come a point during
20   the evening of January 13th, 2007 when you were
21   summoned to the O Street entrance?
22   A.   Yes.

5 (Pages 17 to 20)

**17**

1  standing when you first saw him?
2      A.  In -- on the sidewalk on O Street.
3      Q.  And describe his appearance.
4      A.  He seemed totally fine.  I mean --
5      Q.  Was he talking to you, Mr. Blair?
6      A.  As I came up -- as I came up he's,
7  you know -- as I kind of trying to figure
8  out -- I had no idea what had happened or what
9  was going on.
10     Q.  When you first laid eyes on Mr.
11  Patten, who you know was Mr. Patten, did you
12  know his name?
13     A.  Yes.
14     Q.  Okay.  And how did you know Mr.
15  Patten's name?
16     A.  I've known Jarrod for -- since
17  summer of '92, probably.
18     Q.  Okay.  So am I correct in stating
19  that when you laid eyes on him you knew exactly
20  who it was, that it was Jarrod Patten?
21     A.  Yes, Jarrod.
22     Q.  Yeah, Jarrod Patten.  Excuse me.

**18**

1          Okay.  Did -- was Mr. Patten talking
2  to you?
3      A.  As I came out I was kind of like
4  trying to figure out what was going on.  I
5  said, Jarrod -- I'm like, hey -- I'm like, hey,
6  you know, I didn't even know Jarrod was
7  involved in what was going on.  I'm like, hey,
8  Jarrod, what's going on, what's up.  He's like,
9  you know -- there's a lot of screaming and
10  yelling going on.
11     Q.  Who is doing all the screaming and
12  yelling you're talking about?
13     A.  Casey pretty much was doing most of
14  the screaming and yelling.
15     Q.  Where was Casey?  And that's Casey
16  Patten, correct?
17     A.  Yes.
18     Q.  Where was Casey Patten in relation
19  to his brother, Jarrod?
20     A.  He was kind of -- as I came out,
21  Casey was kind of in the forefront and Jarrod
22  was kind of back a little bit, probably a few

**19**

1  feet behind him.
2      Q.  All right.  And just describe for me
3  how Casey appeared to you when you first saw
4  him?
5      A.  Completely out of control.
6      Q.  What do you mean by that?
7      A.  He was -- seemed to be incredibly
8  intoxicated and was screaming and yelling and
9  incredibly aggressive towards me, who -- I had
10  never seen Casey before ever -- and quickly
11  assumed or found out that Casey was Jarrod's
12  younger brother.
13     Q.  Okay.
14         MR. COBURN:  Objection.  Motion to
15  strike.  No foundation for part of that.
16         BY MR. MITCHELL:
17     Q.  Okay.  You can answer my question.
18         When you first laid eyes on the
19  person you now know to be Casey, did you know
20  that that was Casey Patten?
21     A.  No.
22     Q.  Okay.  Had you ever met Casey Patten

**20**

1  before?
2      A.  Not that I remember.
3      Q.  Was Casey Patten standing or on the
4  ground when you first laid eyes on him?
5      A.  Standing.
6      Q.  Were any of your door guys around
7  him when you first laid eyes on him?
8      A.  No.
9      Q.  Did he appear to you to have been
10  beaten when you first laid eyes on him?
11     A.  No.
12         MR. COBURN:  Objection.  No
13  foundation.
14         BY MR. MITCHELL:
15     Q.  Did his face bear the markings of
16  any blood or trauma?
17     A.  No.
18     Q.  Did his clothes look disheveled?
19     A.  Slightly, yes.
20     Q.  All right.  Were his clothes ripped?
21     A.  I don't remember.
22     Q.  Did his body, that is, below his

Case 1:07-cv-01277-JDB    Document 38-5    Filed 04/18/2008    Page 5 of 7
DEPOSITION OF ROBERT K. BLAIR
CONDUCTED ON MONDAY, FEBRUARY 11, 2008

6 (Pages 21 to 24)

21

1  neck appear to be in pain based on your
2  observation?
3       MR. COBURN: Objection. No
4  foundation.
5       THE WITNESS: Am I supposed to
6  answer?
7       BY MR. MITCHELL:
8    Q.  Yes.
9    A.  No.
10   Q.  Now -- so tell me what happened
11  next. You came outside. Casey appeared to be
12  out of control. Jarrod was engaged in a
13  conversation with you; is that right?
14   A.  Jarrod -- yeah. Jarrod and I are
15  friends. Jarrod is kind of like, you know,
16  what's going on, you know, what's -- you know,
17  something to the effect of, you know, what's
18  wrong with your door guys. You know, I had no
19  idea what had happened so I'm kind of like I
20  don't know -- you know, I don't know what's
21  happened so I'm kind of trying to gather
22  information.

22

1       As I'm out there trying to kind of
2  settle everything down and, you know, Jarrod is
3  kind of -- you know, Jarrod is just kind of
4  trying to talk to me like this is, you know --
5  this is bullshit, you know. Stuff like that.
6  And I'm kind of like what -- you know, what's
7  up.
8       And this whole time I'm kind of
9  trying to make sure, you know, everything is
10  kind of settling down and Casey is pretty much
11  doing whatever he can to keep inciting what had
12  happened or what was happening and then Casey
13  got up kind of -- you know, I -- by that time
14  Jarrod had said my brother -- you know, this is
15  my brother.
16       And so I said -- you know, I went
17  over and I was like -- you know, I'm like, hey,
18  what's going on. I'm like, what's the problem,
19  and Casey just tried to fight me.
20   Q.  So you didn't --
21       MR. COBURN: Object to the
22  characterization earlier in your answer.

23

1       BY MR. MITCHELL:
2    Q.  Did he take -- did Casey Patten take
3  a punch at you or take a swing at you?
4    A.  No. No. He -- he -- you know, I
5  was trying to calm him down. I was trying to
6  see what was going on and he was so
7  intoxicated, messed up, whatever you want to
8  say, that he basically, you know, told me to
9  fuck off.
10   Q.  Okay.
11   A.  And to get out of his face and then
12  tried to kind of -- was trying to kind of get
13  past me to start fighting the door guys again.
14       MR. COBURN: Objection. No
15  foundation.
16       BY MR. MITCHELL:
17   Q.  I want to get an idea of where you
18  were standing when you had this sort of
19  interaction with Casey. You were outside the O
20  Street entrance? Were you directly outside the
21  threshold to O Street?
22   A.  Yes.

24

1    Q.  And if one is standing there facing
2  the outside of O Street, where was Casey Patten
3  in relation to you personally?
4    A.  A little over to the right.
5    Q.  Okay.
6    A.  Towards Wisconsin Avenue.
7    Q.  Excuse me. I interrupted you.
8       Where was Jarrod Patten standing
9  while you were --
10   A.  Kind of a little bit back kind of
11  more towards O Street.
12   Q.  Okay. Did Jarrod Patten tell you
13  that one of your door guys had attacked him?
14   A.  No.
15   Q.  Okay. How long did you -- did you
16  have this interaction with Casey Patten in that
17  incident?
18   A.  You know, probably about three
19  minutes, I would say. I mean, you know, all I
20  was really honestly trying to do is just settle
21  everything down. I mean, that's kind of what I
22  do in any situation like that. It's kind of

25

1 like, all right, let's all calm down and chill
2 out.
3    Q.   Okay.  Were you able to accomplish
4 that, Mr. Blair?
5    A.   No.
6    Q.   Tell me why.  What happened?
7    A.   Casey came around me, started back
8 towards the door guys.  I tried to kind of --
9 you know, I tried to kind of get in front, in
10 between them, tried to talk, say, hey, listen,
11 let's cam down.  You know, let's settle down.
12 He didn't really want to have any part of that.
13 He was pretty fired up.  Pretty aggressive.
14    Q.   Did he appear impaired to you?
15    A.   Yes.  Absolutely.
16    Q.   Have you ever seen a person on
17 drugs, Mr. Blair?
18    A.   Well -- yes.
19    Q.   All right.  In your -- in your
20 opinion, did he appear to be under the
21 influence of any narcotics when you saw him?
22       MR. COBURN:  Objection.  No

26

1 foundation.
2       THE WITNESS:  I have no idea.  I
3 mean, I couldn't answer that.  I mean, I --
4       BY MR. MITCHELL:
5    Q.   All right.  Could you describe his
6 state of mind?
7    A.   I mean, I deal with drunk people.
8 That's my life.  You know, this is what I do
9 every Friday and Saturday for the last 15
10 years, so I feel I'm pretty much an expert in
11 dealing with drunk people.
12    Q.   Was there any doubt in your mind
13 that he was intoxicated?
14    A.   Absolutely not.
15    Q.   Was he greatly intoxicated or just a
16 little?
17       MR. COBURN:  Objection.  No
18 foundation.
19       THE WITNESS:  Highly intoxicated.
20       BY MR. MITCHELL:
21    Q.   Now, what door guys were present
22 while you were interacting with Casey Patten?

27

1    A.   They were all -- I told all the door
2 guys to kind of stay behind.  You know, I was
3 like, stay behind me.  Stay.  You know, don't
4 come out.
5    Q.   Were they outside the threshold of O
6 Street or inside?
7    A.   They were right -- kind of in right
8 at the threshold.
9    Q.   Okay.
10    A.   Like right -- maybe standing a
11 little bit outside the threshold.
12    Q.   Okay.
13    A.   But they were behind me.  And at
14 that point while I was trying to kind of figure
15 out what was going on, talking to Jarrod,
16 dealing with Casey, you know, there's obviously
17 some more screaming going on.  Jarrod is kind
18 of screaming at the door guys.  Casey is kind
19 of screaming at the door guys over me.  I'm
20 kind of trying to just be -- you know, tell
21 everybody just to calm down.  I'm telling the
22 door guys to, you know, stay there.  You know,

28

1 I'm like, don't go anywhere.  Don't move.
2    Q.   Right.  You were trying to be the
3 peacemaker.  Is that fair to say?
4    A.   Yes.  Absolutely.
5    Q.   Okay.  Now, tell me how the
6 situation evolved at the point you just
7 described.
8    A.   Sorry, say that again.
9    Q.   Well, you were trying calm down
10 everybody trying to be the peacemaker, what
11 happened next?
12    A.   At that point as, you know, I was,
13 as I said, trying to be peacemaker.  It really
14 wasn't working.  There was so much -- you know,
15 I don't know what had happened.  Obviously I
16 missed the first part of the whole thing so
17 there was so much anger going on on both sides,
18 not so much with Michael, who is my head door
19 guy who is very level headed, but more -- more
20 towards, you know, Greg was very, very angry at
21 what had happened.
22    Q.   Okay.  Did you talk to Greg?

DEPOSITION OF ROBERT K. BLAIR
CONDUCTED ON MONDAY, FEBRUARY 11, 2008

188

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2         I, Bonnie Russo, Court Reporter, the

3    officer before whom the foregoing proceedings

4    were taken, do hereby certify that the

5    foregoing proceedings were taken, do hereby

6    certify that the foregoing transcript is a true

7    and correct record of the proceedings; that

8    said proceedings were taken by me

9    stenographically and thereafter reduced to

10   typewriting under my supervision; and that I am

11   neither counsel for, related to, nor employed

12   by any of the parties to this case and have no

13   interest, financial or otherwise, in its

14   outcome.

15        IN WITNESS WHEREOF, I have hereunto set

16   my hand and affixed my notarial seal this 20th

17   day of February, 2008.

18   My commission expires:  May 14, 2010

19   *Bonnie Russo*

20   NOTARY PUBLIC IN AND FOR THE

21   DISTRICT OF COLUMBIA

22



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

NEILL S. BASSI,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        Civil Action No.: 07-1277 (JDB)
                                   )
JARROD M. PATTEN, et al,           )
                                   )
        Defendants.                )

## PLAINTIFF NEILL S. BASSI'S
## ANSWERS TO DEFENDANT JARROD M. PATTEN'S INTERROGATORIES

COMES NOW Plaintiff Neill S. Bassi, by undersigned counsel, pursuant to Rule 33 of the Federal Rules of Civil Procedure, and answers the Interrogatories of Defendant Jarrod M. Patten.

### *General Objections to All Interrogatories*

1.      Plaintiff objects to Defendant's Interrogatories (including the accompanying definitions and instructions) to the extent that the Interrogatories seek answers that constitute attorney work product, disclose the mental impressions, conclusions, opinions or legal theories of any attorneys for Plaintiff, contain privileged attorney-client communications, or are otherwise protected from disclosure under applicable privileges, laws or rules.

2.      Plaintiff objects to Defendant's Interrogatories to the extent that they seek information prepared in anticipation of litigation.

3.      Plaintiff objects to Defendant's Interrogatories to the extent that they are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Plaintiff objects to Defendant's Interrogatories to the extent that the answers call for a legal conclusion.

14.    Plaintiff's general objections shall be deemed to continue throughout the responses to specific Interrogatories that follow, even where not further referred to in such responses.

**Without waiving the foregoing objections**, Plaintiff Neill S. Bassi responds and specifically objects to Defendant's Interrogatories as follows:

1.    State your full name, address, date of birth, and Social Security number.

**Answer:**    Neill S. Bassi, 45 Almaden Court, San Francisco, CA 94118; 11/27/05. Plaintiff objects to the part of Interrogatory No. 1 requesting his social security number on the ground that this information is neither relevant to the case nor reasonably calculated to lead to the discovery of admissible evidence.

2.    Describe in detail the events leading up to, including, and immediately following the complained of incidents. In doing so, please describe your impressions of the emotional and physical state of those involved or in the area, including whether they seemed belligerent or intoxicated and the reasons for which you contend the complained of incidents occurred.

**Answer:**    Prior to the incident, Plaintiff was seated inside the O Street entrance to Smith Point performing his regular duties as a door guy, including collecting cover charges from patrons who were pre-approved admittees. Shortly before 2:30 a.m., Plaintiff left his seated station inside the O Street entrance and brought the ropes and posts inside and then stood at the entrance to curtail further admission. At about 2:30 a.m., the Defendants approached the O Street entrance. When Defendants reached the doorway where Plaintiff was standing, both Defendants demanded admission to Smith Point. Defendants appeared and sounded intoxicated. In response to Defendants' demand, Plaintiff told Defendants that Smith Point was closed. Defendant Jarrod M. Patten in an aggressive manner stated "Are you kidding? Go get Bo. I know

3

Bo. Bo will let us in." Plaintiff responded "If you know Bo, then you can call Bo, and he will let you in." When Defendants heard this information, they became enraged. Defendant Jarrod M. Patten, among other abusive statements, told Plaintiff "F___ you, do you know who we are? Go get Bo, he'll let us in." Both Defendant Jarrod M. Patten and Defendant Casey T. Patten also began to curse Plaintiff in a stream of abusive and profane language. As Defendants' verbal abuse of Plaintiff escalated, Plaintiff called one of the other door guys to come up and Plaintiff walked away from the O Street entrance and allowed the two other door guys to take his place in front of Defendants. As Plaintiff was back from the O Street entrance, he could see and hear Defendants aggressively state such things as "f___ you, we own this city."

Suddenly, Defendant Casey T. Patten punched one of the other door guys in the face. The left side door guy who received this punch immediately reached out and took hold of Defendant Jarrod M. Patten's jacket, which he held for a brief period of time. Defendant Casey T. Patten then threw a second punch at the same door guy, which missed the door guy but struck a female bystander, Hannah Freeman. When Defendant Casey T. Patten's second punch missed the door guy but hit the woman's face, both door guys stepped over the threshold in order to restrain Defendant Casey T. Patten until police could be summoned to the scene. The two door guys and Defendant Casey T. Patten moved to the right (toward Wisconsin Avenue) outside the O Street entrance.

At this point, Plaintiff, who was back from the entrance, moved forward and stepped through the doorway of the O Street entrance onto the sidewalk. When Plaintiff exited the O Street entrance, Defendant Jarrod M. Patten was back away from the doorway and off to the Plaintiff's left. As Plaintiff exited the doorway, Defendant Jarrod M. Patten, who was positioned to the left of Plaintiff, charged Plaintiff. As Defendant Jarrod M. Patten charged Plaintiff,

Plaintiff put both hands out to stop him and protect himself, and Defendant Jarrod M. Patten grabbed Plaintiff's right arm and ripped it behind Plaintiff's back.  Plaintiff immediately felt his right arm go numb.  At that point, Defendant Jarrod M. Patten let Plaintiff's arm go and passed by him.  Defendant Casey T. Patten then charged Plaintiff.  Plaintiff defended himself against Defendant Casey T. Patten's charge by grabbing Defendant Casey T. Patten and took him to the ground.  As Plaintiff held Defendant Casey T. Patten to the ground in an attempt to restrain him, Defendant Casey T. Patten kept trying to fight Plaintiff.  Plaintiff repeatedly told Defendant Casey T. Patten to stop and he would be let up.  Defendant Casey T. Patten eventually stopped, so Plaintiff let him go, at which point Plaintiff got up, and went back through the O Street entrance to get the owner of Smith Point.

     4.     Identify all persons, including their names, addresses and telephone numbers, who witnessed the complained of incidents or arrived at the scene of the complained of incidents within two hours after their occurrence and describe what you believe each such person knows.

     **Answer:**

Neill S. Bassi

Mike Hill
Georgetown University
Yates Memorial Field House
Box 571126
Washington, D.C. 20057-1126
(202) 687-2400
A door guy on duty at the time of the incident. Has knowledge pertaining to liability and damages.

Greg Davis
GAP International
700 Old Marble Road
Springfield, PA 19064
(610) 328-0308
(240) 876-6274
A door guy on duty at the time of the incident. Has knowledge pertaining to liability.

and/or Counterclaim and indicate the date on which such persons gave you any such statements and attach a copy or copies to your responses.

    **Answer:**  Hannah Freeman signed a statement on August 8, 2007.  It is attached to Plaintiff's Response to Document Request No. 11.

    6.     If you contend that a person not a party to this lawsuit acted in such a manner as to cause or contribute to the January 14, 2007 incident described in the Complaint and/or Counterclaim, identify each person and describe and provide the basis for each act upon which you rely to support any such contention.

    **Answer:**     Plaintiff makes no such contention at this time.

    7.     Describe Plaintiff's duties and responsibilities as an employee of Restaurant Enterprises, Inc. t/a Smith Point.

    **Answer:**     Plaintiff's duties and responsibilities as an employee of Restaurant Enterprises, Inc. t/a Smith Point, included showing up for work at the time designated by Robert K. Blair, removing tables and chairs from the main room to make room for dancing,  setting up the chair and table near the O Street entrance, setting up the ropes used to form the line outside the O Street entrance, and stationing himself at the table inside the O Street entrance to collect cover charges from patrons as they came through the O Street entrance.  When the time for "last call" approached, Plaintiff's duties, as directed by Robert K. Blair, included leaving his seat at the table where cover charges were collected and stationing himself at the O Street entrance to inform persons who approached that entrance that there was no further admission to Smith Point. When directed by Robert K. Blair, Plaintiff also stood in the bar. At the conclusion of the night, Plaintiff's duties included asking people to leave, sweeping up the floor inside Smith Point, putting the tables and chairs back into position, and other odd jobs.

**Answer:**    On or about February 15, 2007, Plaintiff attempted to participate in one

work out with members of the Georgetown lacrosse team.   After only a few minutes of action,

the pain in Plaintiff's right shoulder was so great that he was forced to stop playing.   Plaintiff

took himself off the lacrosse field and did not return.


       I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE
CONTENTS OF THE FOREGOING PAPER ARE TRUE TO THE BEST OF MY
KNOWLEDGE, INFORMATION, AND BELIEF.

Date: 11/16/07

Neill S. Bassi


       Respectfully submitted,

       NEILL S. BASSI

By:

       Eric D. Mitchell (D.C. Bar No. 438607)
       Bode & Grenier, L.L.P.
       1150 Connecticut Avenue, N.W.
       Ninth Floor
       Washington, D.C.  20036
       (202) 828-4100
       (202) 828-4130 (fax)
       *Counsel for Plaintiff*

17

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2                   Civil Division

3    - - - - - - - - - - - - -x
                              :
4    NEILL S. BASSI,          :
                              :
5           Plaintiff,        :
                              :
6      vs.                    : Civil Action No.
                              : 07-1277 (JDB)
7    JARROD M. PATTEN, et al.,:
                              :
8           Defendants.       :
                              :
9    - - - - - - - - - - - - -x

10

11                              Washington, D.C.

12                              Tuesday, March 18, 2008

13        Videotaped Deposition of

14            NEILL S. BASSI

15        a Plaintiff, taken on behalf of counsel for

16   the Defendant Casey T. Patten in the above-entitled

17   matter, before Denise M. Brunet, RPR and Notary Public

18   in and for the District of Columbia, taken at the

19   offices of Mallon & McCool, 1776 K Street, Northwest,

20   Suite 200, Washington, D.C., commencing at 2:04 p.m.,

21   when were present on behalf of the respective parties:

22

256c3306-67a8-483b-b0e0-55b93f9d110f

Page 6

1  you want me to start talking about when I got to work?
2      BY MR. COBURN:
3      Q   Start talking about when you got to work
4  that night at Smith Point, and then tell us if
5  anything unusual happened prior to the time the
6  Pattens came to the O Street door.  Then tell us what
7  happened during the course of the incident, just in as
8  much detail, with as much care as you can remember it,
9  and then tell us if anything happened later, like, for
10  example, if there was any interaction between you and
11  the other door people or you and Bo Blair until as
12  such time as you went home.
13      MR. MITCHELL: Objection.
14      THE WITNESS: Well, I got to work at Smith
15  Point Saturday night and probably did the usual
16  activities, went in, waited around until every one
17  finished eating dinner, picked up the tables, started
18  moving the chairs, then took a table up to the O
19  Street entrance and probably took a chair up with me,
20  then took a -- usually another chair up as well, up to
21  the O Street entrance.  We would then set up the
22  posts, the other door guys and I.

Page 8

1  Bo.  We told him the doors were closed and that if he
2  knew Bo, he should call Bo.
3      From there, he became increasingly
4  aggressive.  I'd say both brothers did.  You know,
5  they became -- demand to be let into Smith Point.
6  And, you know, we've dealt with kind of drunk,
7  demanding patrons a lot, you know, never with this
8  sort of intensity as the night, you know, progressed.
9      But, you know, we've dealt with guys coming
10  up to the door a lot saying, you know, I know Bo, let
11  me in.  And, you know, like the form response we
12  always give is, you know, if you know Bo, you can call
13  Bo.  Because if they did know Bo, they'd have Bo's
14  number and they'd give Bo a call.  And, you know, that
15  was rules instructed by Bo, you know, if they knew Bo
16  and they said they knew him, then he can give him a
17  call.
18      When I gave them that answer, they seemed
19  to get increasingly hostile, at which point in time, I
20  stepped away from the door and was replaced by Greg
21  Davis and took a step back.  They continued to argue
22  with Mike Hill and Greg Davis and, from which point,

Page 7

1      From there, we would work the Wisconsin
2  Street door for a bit until we were instructed to move
3  over to the O Street entrance, at which point in time,
4  we would open up the O Street entrance doors, finish
5  setting up the ropes, go get the list downstairs.  I
6  would get the door cash from either the manager or if
7  Bo had arrived, from Bo.
8      Once I did that, it would be just like any
9  other night, you know, I'd be working the money on the
10  inside up against the wall with the table and the
11  chair, and Greg Davis and Mike Hill and Jay would be
12  working out the street, you know, working on the ropes
13  and whatnot.
14      At around 2:00, like all nights, we broke
15  down the ropes, put the list downstairs, gave Bo the
16  cash and closed shop for the night, shut the doors --
17  not shut the doors, but we weren't allowing anyone
18  else in.
19      At around 2:30, the Patten brothers showed
20  up requesting to be admitted into Smith Point.  They
21  approached.  Jarrod Patten, you know, said, you know,
22  can we get in, let's get in, I'm on the list, I know

Page 9

1  completely unprovoked, Casey Patten threw a punch at
2  Mike Hill.  He then unprovokingly threw a second punch
3  at Mike Hill, which happened to hit a girl standing
4  near Mike, at which point, Mike Hill and Greg Davis
5  proceeded to exit the Smith Point doorway onto the O
6  Street sidewalk leaving out to the right.  I went out
7  straight, a little bit to the left, and Jarrod Patten
8  approached me, grabbing my right arm, swinging it up
9  behind me, spinning me around.
10      By the time I collected myself, Casey
11  Patten was now approaching me, coming towards me, at
12  which point I defended myself and took him to the
13  ground, held him to the ground until -- you know,
14  asking him, you know, stop fighting with me, I'll let
15  you up.  Just stop fighting with me, I'll let you go.
16      And after a little bit of time, he gave up.
17  You know, he kind of just released the grabbing of my
18  jacket and, at which point, I stood up and headed
19  downstairs to go grab Bo.  I told Bo, who was at the
20  DJ booth, I need you right now.  He came upstairs.  We
21  proceeded out to the O Street doorway and by that
22  time, it looked like most of the fight had been broken

Page 18

1    A    So come at me. And I'm just taking him
2  down this way (indicating).
3    Q    What do you grab him with?
4    A    I would have grabbed him probably under his
5  arm maybe, his shoulder, jacket, you know -- not
6  jacket, but, you know, shoulder, under arm area, with
7  my left, not much with my right, because I didn't have
8  much going on with my right then, and used his force
9  coming at me to take him down to the ground and kind
10  of rolling that way (indicating).
11    Q    Did he end up on his back?
12    A    Yes.
13    Q    You can -- thanks very much.
14        And after Mr. -- after Casey Patten goes to
15  the ground and is on his back, what happens then,
16  immediately afterwards? He's just come down to the
17  ground, he's on his back and then what do you do?
18    A    I just hold him there.
19    Q    How?
20    A    I have one arm, my left, through his -- in
21  between his legs, holding his left leg with his knee
22  towards his head, and my other arm is wrapped around

Misty Klapper & Associates
703-780-9559

Page 19

1  him and just holding him down like this (indicating).
2    Q    So you have -- your two hands are clenched
3  together, as you just demonstrated?
4    A    Correct.
5    Q    Behind him?
6    A    No. His head would be underneath my arm.
7  His leg would be over my -- no. His head would be
8  above my arm. Is that -- like if you were kind of
9  cradling somebody, but you're holding them on the
10  ground.
11    Q    What happened immediately after that?
12  Well, let me ask you this question: How long did you
13  hold him down like that?
14    A    Maybe 20 seconds or so.
15    Q    Is there any conversation between the two
16  of you during that?
17    A    He was struggling against me trying to --
18  you know, trying to fight me and attack me, and I just
19  told him to give up and I'd let him up.
20    Q    What happened then?
21    A    Once he stopped grabbing the cuffs of my
22  jacket and the sleeves of my jacket, I -- he kind of,

Misty Klapper & Associates
703-780-9559

Page 20

1  you know, let go, released. I just stood up off of
2  him.
3    Q    What did he do after you stood up and got
4  off him?
5    A    I don't know. I went downstairs.
6    Q    Immediately after you stood up and got off
7  him, you went downstairs?
8    A    Correct.
9    Q    And who did you talk to first once you got
10  downstairs?
11    A    Bo Blair.
12    Q    Tell us about the conversation between you
13  and Bo Blair, as best you can remember it.
14        MR. MITCHELL: Objection.
15        THE WITNESS: I told him I needed him right
16  now.
17        BY MR. COBURN:
18    Q    What, if anything, did he say?
19    A    He didn't say anything. He just came.
20    Q    Came where?
21    A    Off the DJ booth.
22    Q    And then did the two of you go somewhere?

Misty Klapper & Associates
703-780-9559

Page 21

1    A    Yes.
2    Q    Where did you go?
3    A    To the O Street entrance.
4    Q    So after Casey Patten got up, you went
5  downstairs into the club, got Bo Blair and you and Bo
6  Blair then returned to where the incident had
7  occurred?
8    A    I'm sorry, can you -- I wasn't -- can you
9  repeat that?
10    Q    Sure. That's okay. Casey Patten goes down
11  to the ground. He's on his back. You're holding him
12  down from the period of time you described for us.
13  There came a time when you let him up. You then went
14  down the stairs, got Bo Blair, told him you needed him
15  right now, and then you and Mr. Blair went back up the
16  stairs to -- outside the O Street entrance where the
17  incident had occurred; is that right?
18    A    Correct.
19    Q    Who did you first tell about the fact that
20  you were injured?
21    A    I don't remember.
22    Q    What is the first conversation about your

Misty Klapper & Associates
703-780-9559

CERTIFICATE OF NOTARY PUBLIC

I, Denise M. Brunet, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and thereafter reduced to print by means of computer-assisted transcription by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to this litigation and have no interest, financial or otherwise, in the outcome of this matter.

_____
Denise M. Brunet
Notary Public in and for the
District of Columbia

My commission expires:
November 30, 2012

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| NEILL S. BASSI | ) | |
| | ) | |
| Plaintiff/Counter-Defendant | ) | |
| | ) | |
| v. | ) | Civil Action No.: 07-1277 (JDB) |
| | ) | |
| JARROD M. PATTEN | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CASEY T. PATTEN | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## DEFENDANT JARROD PATTEN'S RESPONSE TO REQUEST FOR ADMISSIONS

Defendant Jarrod Patten, as and for a Response to Plaintiff's Request for Admissions hereby sets forth as follows:

Request No. 1: Please admit that you and Casey Patten arrived at Smith Point on January 14, 2007 after 2:15 a.m.

Response: After reasonable inquiry, the information known, or that can be readily obtained, by the Defendant is insufficient to enable the Defendant to admit or deny.

Request No. 2: Please admit that when you arrived at Smith Point on January 14, 2007, you had consumed approximately two to three bottles of beer in the preceeding five hours.

Response: Admit.

1

Request No. 3:     Please admit that when you arrived at Smith Point on January 14, 2007, you had consumed approximately two to three vodka/soda drinks in the preceeding two hours.

Response:     After reasonable inquiry, the information known, or that can be readily obtained, by the Defendant is insufficient to enable the Defendant to admit or deny.

Request No. 4:     Please admit that when you arrived at Smith Point on January 14, 2007, you had consumed approximately one tequila shot in the preceeding two hours.

Response:     After reasonable inquiry, the information known, or that can be readily obtained, by the Defendant is insufficient to enable the Defendant to admit or deny.

Request No. 5:     Please admit that you and Casey Patten visited Rosa Mexicano at 575 7th Street, NW, Washington DC, on January 14, 2007.

Response:     Admit.

Request No. 6:     Please admit that you and Casey Patten visited Rosa Mexicano on January 14, 2007 in the two hours before you arrived at Smith Point.

Response:     Admit.

Request No. 7:     Please admit that when you arrived at Smith Point on January 14, 2007, you had consumed approximately two to three vodka/soda drinks at Rosa Mexicano on January 14, 2007.

Response:     Admit.

2

Request No. 8:   Please admit that when you consumed approximately one tequila shot at Rosa Mexicano on January 14, 2007.

Response:   Admit.

Request No. 9:   Please admit that you and Casey Patten split the bill at Rosa Mexicano on January 14, 2007.

Response:   Admit.

Request No. 10:   Please admit that Exhibit 1 to these requests is a true and correct copy of the bar tab from Rosa Mexicano for you and Casey Patten on January 14, 2007.

Response:   Admit.

Request No. 11:   Please admit that Exhibit 2 to these requests is a true and correct copy of your credit card receipt for half of the bill from Rosa Mexicano on January 14, 2007.

Response:   Admit.

Request No. 12:   Please admit that your signature appears on Exhibit 2 to these requests.

Response:   Admit.

Request No. 13:   Please admit that your half of the bill from Rosa Mexicano on January 14, 2007, totaled $27.50.

Response:   Admit.

Request No. 14:   Please admit that you tipped the server at Rosa Mexicano on January 14, 2007 thirty dollars ($30.00).

Response:   Admit.

3

Respectfully submitted,

**MALLON & MCCOOL, LLC**

DANIEL T. McNAMARA
D.C. Bar No.: 494834
Mallon and McCool, LLC
1776 K Street, N.W., Suite 200
Washington, D.C. 20006
(202) 393-7088

Attorney for Defendant Jarrod Patten

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

NEILL S. BASSI                                    )
                                                  )
    Plaintiff/Counter-Defendant              )
                                                  )
               v.                    )        Civil Action No.: 07-1277 (JDB)
                                                  )
JARROD M. PATTEN                                  )
                                                  )
    Defendant                                 )
                                                  )
and                                               )
                                                  )
CASEY T. PATTEN                                   )
                                                  )
    Defendant/Counter-Plaintiff.              )

## DEFENDANT/COUNTER-PLAINTIFF CASEY T. PATTEN'S RESPONSE TO PLAINTIFF'S INTERROGATORIES

Defendant/Counter-Plaintiff Casey T. Patten (hereinafter "Defendant" or "Casey Patten"), by and through undersigned counsel, hereby submits the following in response to Plaintiff's Interrogatories.

### Introduction

The word usage, sentence structure and syntax may be that of the attorney assisting in the preparation of these responses, and thus does not necessarily purport to be the precise language of the executing party. These responses to Plaintiff's interrogatories furnish knowledge, facts and information presently available. If subsequent or different information is obtained before trial, these interrogatories will be appropriately supplemented, either formally or informally by communicating the information to all parties. Thus, Casey Patten reserves the right to supplement these interrogatories at any time.

**RESPONSE:** Defendant objects to this interrogatory in that it seeks information that should not be disclosed absent a Protective Order. Subject to and without waiving this or any other objection, Defendant responds as follows: <u>See</u> Interrogatory Response No. 5.

**INTERROGATORY NO. 7:** Within 24 hours of the Incident, did you use or take any alcoholic beverage, marijuana, or other drug or medication of any kind (prescription or nonprescription)? If so, for each substance state.

    (a) The nature or a description of the substance;
    (b) The quantity used or consumed;
    (c)The date and time of days when it was used or taken;
    (d) The address where it was used or taken;
    (e) The identity of any persons present at the time of using or taking the substance; and
    (f) The identity of any health care provider that prescribed or furnished the substance, and the condition for which it was prescribed or furnished.

**RESPONSE:**

    (a) Beer (Yuengling)
    (b) Five Beers,
    (c) January 13th 2007;
    (d) 777 7th Street NW
    (e) David Mazza (202-352-5668), The-Uyen Truong (202-277-6948), Justin Cook (202-446-7371), Carrie Pais (202-607-7193), Jarrod Patten, Priscilla Cooney (202-841-7347), Danielle Davidson (571-480-2612), Jon Evans (571-243-6731).
    (f) N/A.

    (a) Tequila (Patron)
    (b) Three Tequila Shots
    (c) January 13th and 14th 2007;
    (d) 575 7th Street NW;
    (e) Jarrod Patten and possibly Priscilla Cooney, David Mazza, The-Uyen Truong. Justin Cook, Carrie Pais.
    (f) N/A.

**INTERROGATORY NO. 23:**    State your full understanding of the facts and circumstances surrounding the Incident, and include in your answer the exact time the Incident occurred.

**RESPONSE:** Defendant objects to this interrogatory in that it seeks information protected by the attorney-client privilege and work product doctrine. Defendant objects to this interrogatory on the grounds that it is unduly burdensome, vague and/or overly broad. Subject to and without waiving these or any other objections, Defendant responds as follows:  On the morning of January 14, 2007, Casey Patten and Jarrod Patten went to Smith Point at about 2:20 a.m. -- prior to the time this establishment was scheduled to close. Neill Bassi and another man were standing directly inside the doorway of Smith Point.  Neither Casey Patten nor Jarrod Patten crossed the threshold of Smith Point. They stood outside. Casey Patten and Jarrod Patten asked to enter Smith Point so they could join their friends who frequented Smith Point and were already inside. Mr. Bassi and another man told Casey Patten and Jarrod Patten that Smith Point was closed.  Casey Patten and Jarrod Patten advised Mr. Bassi and the other man that Smith Point remains open until 3:00 a.m. and no one was leaving. Mr. Bassi and the other man said nothing. Jarrod Patten asked Mr. Bassi and the other man to notify the owner of Smith Point that he was at the door.  Casey Patten asked them to notify Winston Lord. Mr. Bassi and the other man responded by taunting and inciting Jarrod and Casey Patten.  One of the bouncers told Jarrod Patten and Casey Patten, while they were standing outside in the rain, to contact the owner of Smith Point themselves.  Words were exchanged between the Pattens and Mr. Bassi and the other man, but at no point did Jarrod or Casey Patten taunt these men.  Neither Jarrod Patten nor Casey Patten attempted to force their way inside Smith Point.  Casey Patten punched the second man as he was being taunted. Mr. Bassi and this man charged out of the doorway towards Casey

## VERIFICATION

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct based upon my knowledge, information, and belief.

_____
Casey Patten

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

NEILL S. BASSI,                              )
                                             )
    Plaintiff/Counter-Defendant,         )
                                             )
        v.                          )
                                             )     Civil Action No. 07-1277 (JDB)
JARROD M. PATTEN,                            )
                                             )
    Defendant,                           )
                                             )
    and                                  )
                                             )
CASEY T. PATTEN,                             )
                                             )
    Defendant/Counter-Plaintiff.         )
                                             )
_____           )
                                             )
JARROD M. PATTEN,                            )
                                             )
    Defendant/Third-Party Plaintiff,     )
                                             )
    and                                  )
                                             )
CASEY T. PATTEN,                             )
                                             )
    Defendant/Counter-Plaintiff/         )
    Third-Party Plaintiff,               )
                                             )
        v.                          )
                                             )
GREG DAVIS,                                  )
                                             )
    Third-Party Defendant.               )

**DEFENDANT/COUNTER-PLAINTIFF/THIRD-PARTY PLAINTIFF
CASEY T. PATTEN'S RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION**

Defendant/Counter-Plaintiff/Third-Party Plaintiff Casey T. Patten ("Mr. Patten"), through

undersigned counsel, responds to Plaintiff's Requests for Admission [the "Request"] as follows:

2.

Request:  Please admit that when you arrived at Smith Point on January 14, 2007, you had consumed approximately five bottles of beer in the preceding five hours.

Response: Mr. Patten denies the Request.

3.

Request:  Please admit that when you arrived at Smith Point on January 14, 2007, you had consumed approximately three tequila shots in the preceding two hours.

Response: Mr. Patten admits the Request.

4.

Request:  Please admit that you and Jarrod Patten visited Rosa Mexicano at 575 7th Street, N.W., Washington, D.C. on January 14, 2007.

Response: Mr. Patten admits the Request.

5.

Request:  Please admit that you and Jarrod Patten visited Rosa Mexicano on January 14, 2007 in the two hours before you arrived at Smith Point.

Response: Mr. Patten admits the Request.

6.

Request:  Please admit that you consumed approximately three tequila shots at Rosa Mexicano on January 14, 2007.

Response: Mr. Patten admits the Request.

7.

Request:  Please admit that you and Jarrod Patten split the bill at Rosa Mexicano on January 14, 2007.

Response: Mr. Patten admits the Request.

24.

Request:  Please admit that your adjusted gross income on your Federal Tax Return for 2006 was $64,049.

Response:  Mr. Patten admits the Request.

25.

Request:  Please admit that you had not been to Smith Point in the 12 months prior to January 14, 2007.

Response:  Mr. Patten admits the Request.

Respectfully submitted,

Barry Coburn/JCC

Barry Coburn
(D.C. Bar No. 358020)
COBURN & COFFMAN, PLLC
1244 19th Street, N.W.
Washington, D.C. 20036
Phone: (202) 657-4490
Fax:  (866) 561-9712

Attorney for Defendant/Counter-Plaintiff/Third
Party-Plaintiff Casey T. Patten

7

Case 1:07-cv-01277-JDB   Document 38-12   Filed 07/14/2008   Page 1 of 6
DEPOSITION OF CASEY E. PATTEN
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

9 (Pages 33 to 36)

33

1   would categorize it as friends.
2       Q   Do you know where she lives?
3       A   In Arlington.
4       Q   All right.  When was the last time you spoke
5   to Ms. Davidson?
6       A   I saw Danielle on Saturday.
7       Q   Under what circumstances did you see her on
8   Saturday?
9       A   Danielle came over to my house.
10      Q   Was she by herself?
11      A   No.  She was with her boyfriend, who's the
12  next person on the list.
13      Q   Okay.  Mr. Jon Evans?
14      A   Correct.
15      Q   Where does Mr. Evans reside?  Do you know?
16      A   In Arlington.
17      Q   Does he reside with Danielle Davidson?
18      A   Yes.
19      Q   What does Mr. Evans do for a living?
20      A   Consulting work.
21      Q   That sounds kind of ambiguous.  Do you know
22  what that means?

34

1       A   He does consulting for IT firms.
2       Q   Is he a friend of yours from college?
3       A   No.
4       Q   How did you meet Jon Evans?
5       A   Through mutual friends in the city.
6       Q   Now, what time did all these folks show up
7   at your place on January 13th for the football game?
8       A   Like I stated before, around 8:00 or
9   somewhere after there.
10      Q   All right.  And were you serving food for
11  this get-together?
12      A   Yes.
13      Q   And did you provide the food?
14      A   Yes.
15      Q   Tell me what you served.
16      A   Philly cheese steaks.
17      Q   Did you make those yourself?
18      A   Yes.
19      Q   What else did you serve?
20      A   Pretzels, chips.  I believe that's --
21      Q   All right.  Did you have any help in
22  preparing the food that these guests were going to

35

1   consume at your house that evening?
2       A   No.
3       Q   Did you provide beverages for these folks?
4       A   I did.
5       Q   Tell me what you had available in your
6   apartment for their consumption.
7       A   I believe I bought Yuengling, which is a
8   beer.
9       Q   How much did you buy of Yuengling?
10      A   I don't recall.
11      Q   Anything else?
12      A   No.  That would be it.
13      Q   Where did you buy the Yuengling?
14      A   At Costco.
15      Q   What day did you buy it?
16      A   I believe the same day, the 13th.
17      Q   Do you have a car, Mr. Patten?
18      A   Yes.
19      Q   Did you have a car in January of '07?
20      A   Yes.
21      Q   So I take it you drove to Costco in order to
22  purchase these provisions for the guests coming over?

36

1       A   I can't recall if I did or if I went with
2   somebody.
3       Q   If you went with somebody, who would that
4   have been?
5       A   Myriad of different people.
6       Q   Were you dating anyone in January of '07,
7   Mr. Patten?
8       A   Yes.
9       Q   Who were you dating?
10      A   Priscilla Cooney.
11      Q   So is it possible that Priscilla Cooney
12  accompanied you to Costco in order to purchase the
13  provisions that you were going to have?
14          MR. COBURN:  Objection to what's possible.
15      A   I don't recall.
16  BY MR. MITCHELL:
17      Q   Do you recall whether you actually drove or
18  someone else drove?
19      A   I don't recall.  That's 13 or 14 months ago.
20      Q   All right.  Do you know where the Costco is
21  in Arlington?
22      A   I do.

DEPOSITION OF CASEY T. PATTEN
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

19 (Pages 73 to 76)

73

1    A   The exact wording of it I can't recall.  It
2  was over a year ago.  But probably to the effect we're
3  here and here's our ID's.
4    Q   Okay.  And how did these door guys respond?
5    A   They responded by stating that Smith Point
6  was closed.
7    Q   And what did you do in response to that
8  statement by the door guys?
9    A   Probably made a statement or -- made a
10  statement that I was instructed by Winston Lord to let
11  the doormen know that we were here.
12    Q   Okay.
13    A   I don't think that came out correctly.  Can
14  you read that back?  What I meant to say was --
15    Q   Go ahead.
16    A   Is that okay?
17    Q   Yeah.
18    A   Had told the doormen to -- I was told -- I
19  was told by Winston to instruct the doormen to let
20  them know that we were here and they were to get
21  Winston if it was an issue.
22    Q   And that's what you specifically stated to

74

1  the door guys?
2    A   I believe so.
3    Q   And which door guy did you direct this
4  statement to?
5    A   A broad general statement I believe.
6    Q   I'm trying to figure out which one -- did
7  you direct it to two guys or three guys?
8    A   I don't recall.
9    Q   Which door guy were you closest to,
10  Mr. Patten, when you made the statement?
11    A   The gentleman with the red hat.
12    Q   And where was he standing in relation to the
13  door?
14    A   Along the wall.
15    (Exhibit 6 was marked for identification and
16  were attached to the transcript.)
17  BY MR. MITCHELL:
18    Q   Mr. Patten, the reporter has handed you
19  what's been marked for identification as CP Exhibit
20  Number 6.  Do you recognize the scene depicted in that
21  photograph?
22    A   Yes.

75

1    Q   What is that?
2    A   I believe that's the O Street entrance to
3  Smith Point.
4    Q   And is that the way the doors appeared when
5  you approached the O Street entrance on January 14th,
6  2007?
7    A   I believe so.
8    Q   In other words, were the doors, the two
9  rusty doors there, were they in the same positions in
10  this photograph as they were when you and your brother
11  approached on January 14th, 2007?
12    A   The open door was open.  I can't recall if
13  the second door was open or closed.
14    Q   Okay.  Okay.  If you would, I'd like to ask
15  you to put an X where this Smith Point employee was
16  standing when you asked him to go get Winston Lord as
17  you were instructed by Winston Lord.
18    MR. COBURN:  Objection.  Vague.  If I could
19  just -- the objection is just like you're referring to
20  a particular one?
21    MR. MITCHELL:  Well, I'll try it this way.
22  You stated to me I believe a few minutes ago, before I

76

1  grabbed this exhibit, that you directed a statement to
2  the man in the red hat who was leaning against the
3  wall to go get Winston.
4    MR. COBURN:  Objection.  I think that's a
5  mischaracterization.
6    A   I don't believe that's what I said.  I
7  believe I remember saying there was a gentleman with a
8  red hat.  And you asked me where the gentleman with
9  the red hat was standing.
10    Q   Okay.  Great.  Let's go that route.  Put an
11  X where the gentleman with the red hat was standing
12  when you talked to him.
13    A   (The Witness complies.)
14    Q   And put your initials, Mr. Patten, where you
15  were standing when you spoke to the gentleman with the
16  red hat.
17    MR. COBURN:  If it's in the picture.
18  BY MR. MITCHELL:
19    Q   And please, if you would, with your
20  brother's initials, JP, indicate where he was standing
21  when you were conversing or talking to this gentleman
22  with the red hat.

DEPOSITION OF CASEY T. PATTEN
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

20 (Pages 77 to 80)

77

1    A   Somewhere. Now I need a new space but --
2    Q   Okay. Well, my question is was your brother
3    in front of you when you were talking to this
4    gentleman with the red hat?
5    A   He was.
6    Q   So you were standing behind him?
7    A   That's correct.
8    Q   Where were the other employees standing as
9    you were having this conversation with the guy in the
10   red hat?
11   A   Within the threshold of the door.
12   Q   Now, how did this gentleman in the red hat
13   react to your statement about getting Winston Lord?
14   A   Unresponsive. Non responsive.
15   Q   So he said nothing?
16   A   Almost to the effect of saying nothing and
17   then going back to his conversation.
18   Q   Okay. And what happened then?
19   A   I believe either myself or my brother asked
20   again and maybe had made a plea, come on, help me out
21   here.
22   Q   Okay. At this point were you getting

78

1    frustrated, Mr. Patten?
2    A   Not yet, no.
3    Q   Okay. After you or your brother made the
4    statement, come on, help us out here, what happened?
5    A   I believe that the gentlemen stated that
6    they were closed and they weren't going to be letting
7    anyone else in.
8    Q   Did you believe they were lying to you?
9    A   Lying? No. It didn't make a whole lot of
10   sense knowing -- believing that a bar closed at
11   3:00 o'clock and it was around 2:20 they were closed
12   and no one was coming out of the doors.
13   Q   When you say it doesn't make any sense to
14   you -- so were you confused by what they were telling
15   you, Mr. Patten?
16   A   You've got to define confused. I'm not sure
17   what you're asking me what I was confused about.
18   Q   My question is what was your reaction to
19   what you were learning or hearing the door guys say to
20   you?
21   A   What was my reaction to the way -- I asked
22   another question I believe.

79

1    Q   What did you ask?
2    A   Can you help us out.
3    Q   And what was their response?
4    A   They were nonresponsive. At this point I
5    think my brother had said to the doormen that he had
6    been friendly with Bo Blair and could they go and grab
7    Bo then.
8    Q   Now, is that a statement you directed to the
9    door guys --
10   A   No.
11   Q   -- or your brother?
12   A   I just said my brother.
13   Q   So your brother said something about Bo. Go
14   get Bo.
15       MR. COBURN: Objection. That's a
16   mischaracterization.
17   BY MR. MITCHELL:
18   Q   Were you present when your brother made a
19   statement about Bo Blair?
20   A   I was standing with him.
21   Q   And how did the door guys react to the
22   statement by your brother?

80

1    A   They were being jerks.
2    Q   What does that mean?
3    A   Snickering, made a couple sarcastic comments
4    back.
5    Q   Well, tell me what they said.
6    A   I believe there was some language back and
7    forth along the lines of, well, if you know Bo, go get
8    him yourself or why don't you call him yourself.
9    Statements to that effect.
10   Q   And you heard the door guys say that to your
11   brother?
12   A   Yes, I did.
13   Q   Did you attempt to call Bo Blair as the door
14   guys suggested?
15   A   I don't know Bo Blair.
16   Q   You never met Bo Blair before?
17   A   No.
18   Q   And you never met Bo Blair in your previous
19   visits to Smith Point I take it?
20   A   I never met Bo Blair.
21   Q   When the door guys suggested that you should
22   contact Bo yourself, did your brother try to call Bo

DEPOSITION OF CASEY T. PATTEN
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

21 (Pages 81 to 84)

81

1 Blair?
2    **A  I believe he did.**
3    Q  What did you do after the door guys made
4 this suggestion to you and your brother?
5    **A  I threw a punch at the gentleman with the**
6 **red hat which I shouldn't have done.**
7    Q  Okay. And where were you standing in
8 relation to your brother when you threw this punch?
9    **A  Same area.**
10    Q  Okay. You were here for your brother
11 Jarrod's deposition, were you not?
12    **A  Yes.**
13    Q  Your brother testified that Casey threw the
14 first punch around my head.
15    **A  Uh-huh.**
16    Q  Was your brother Jarrod being accurate?
17       MR. COBURN: Objection. Asking him to
18 comment on someone else's testimony.
19 BY MR. MITCHELL:
20    Q  Was that accurate?
21    **A  Yes.**
22    Q  So you were hiding behind your brother when

82

1 you threw this punch to the door guy?
2       MR. COBURN: Objection.
3 Mischaracterization.
4    **A  Define hiding. I was standing behind.**
5 **BY MR. MITCHELL:**
6    Q  Did the door guy see this punch coming,
7 Mr. Patten?
8       MR. COBURN: Objection. No foundation.
9    **A  I wouldn't know.**
10 **BY MR. MITCHELL:**
11    Q  Did your punch connect?
12    **A  Yes.**
13    Q  Do you believe, Mr. Patten, that throwing a
14 punch at the door guy was the appropriate way to
15 respond to the situation?
16    **A  I do not.**
17    Q  And do you regret throwing that punch?
18    **A  Yes.**
19    Q  Prior to throwing that punch, Mr. Patten,
20 had any of the door guys tried to punch you?
21    **A  No.**
22    Q  Prior to your throwing that punch, had any

83

1 of the door guys tried to punch your brother?
2    **A  I don't believe so.**
3    Q  All right. Now, after you threw that first
4 punch and it connected, did it connect with the
5 gentleman wearing the red hat?
6    **A  I believe so.**
7    Q  Okay. What happened?
8    **A  He got up to push over to retaliate, started**
9 **coming off of -- kind of off of this wall that he was**
10 **on.**
11    Q  I see.
12    **A  Uh-huh.**
13    Q  Tell me what you observed.
14    **A  And he was clearly coming after me and at**
15 **that point I proceeded to throw a second punch.**
16    Q  And with what hand did you throw the first
17 punch?
18    **A  It would be the right hand.**
19    Q  Are you right-handed?
20    **A  I am.**
21    Q  And with what hand did you throw the second
22 punch?

84

1    **A  That would be the left hand.**
2    Q  Are you ambidextrous?
3    **A  I wish.**
4    Q  So how much time passed between the first
5 punch that you threw at this man with the red hat and
6 the second punch that you threw at the man with the
7 red hat?
8    **A  A nanosecond, split second.**
9    Q  A split second. And when you threw this
10 second punch at the gentleman with the red hat, where
11 was your brother Jarrod?
12    **A  Still in front of me.**
13    Q  I couldn't hear that.
14    **A  Still in front of me.**
15    Q  And where were you standing when you threw
16 this second punch? In other words, on Exhibit
17 Number 6 had your position changed from that which
18 you've marked with your initials, CP, at the time you
19 threw the second punch?
20    **A  Potentially within a half foot maybe to the**
21 **left.**
22    Q  Okay. Now, did that second punch connect to

DEPOSITION OF CASEY T. PATTEN
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

22 (Pages 85 to 88)

85

1  the desired recipient?
2      A   I don't believe so.
3      Q   All right.  Did it land -- did it hit
4  anybody?
5      A   Not that I know of.
6      Q   Do you know whether that second punch hit a
7  girl?
8          MR. COBURN:  Objection.  Asked and answered.
9      A   No.
10  BY MR. MITCHELL:
11     Q   Are you familiar with a person named Hannah
12  Freeman?
13     A   No.
14     Q   Never heard of Hannah Freeman?
15         MR. COBURN:  Well, if you're asking -- I
16  think you may be invading the privilege there.  Unless
17  you want to ask him if he's heard about it in a
18  deposition or something like that.
19  BY MR. MITCHELL:
20     Q   A girl named Hannah Freeman was struck by
21  you.  Did you know that?
22         MR. COBURN:  Objection.

86

1  BY MR. MITCHELL:
2      Q   Do you know whether that second punch
3  connected to any person?
4      A   No.
5      Q   So do you think it struck nobody?
6      A   Yes.
7      Q   Okay.  Now, after the second punch was
8  thrown, what happened?
9      A   Are we speaking for at this time?
10     Q   I'm talking about your second punch,
11  Mr. Patten.
12     A   No.
13     Q   What were you saying no to?  You lost me.
14     A   You asked me if I knew, when I threw that
15  second punch, if it hit anybody.  I said no.
16     Q   No, it didn't hit anybody or no, you don't
17  know whether it hit anybody?
18     A   No, I don't know that it hit anybody.
19     Q   And why don't you know that?
20     A   I don't know.
21     Q   Now, where was Mr. Bassi while this was
22  going on; in other words, the first punch you threw

87

1  and the second punch you threw?
2      A   Within the threshold of the door.
3      Q   Was he attempting to throw any punches at
4  you?
5      A   Not immediately.
6      Q   And after you threw this second punch, tell
7  me how the door guys responded.
8      A   They came out like a group of charging
9  bulls.
10     Q   That sounds familiar.  Who came out?
11     A   Gentleman with the red hat on.
12     Q   And who else?
13     A   The gentleman who I believed to learn is
14  Neill Bassi.
15     Q   Turn if you would, Mr. Patten, to page 12 of
16  the answer and counterclaim.
17     A   Sure.
18     Q   Please read paragraph 15 and look up when
19  you've finished reading that paragraph.
20     A   Mr. Bassi -- oh.  Sure.
21     Q   Where were you standing when Mr. Bassi and
22  the other man charged you as you continued to retreat

88

1  along O Street?
2      A   What would you like me to depict for you?
3      Q   Tell you what.  We'll use a better picture.
4      A   I can almost show you with a hand.  It may
5  be easier.  Because it's not much movement from what's
6  already been drawn here.
7      Q   Okay.  Let's do that.  Let's mark this that
8  with a different colored pen.  Show me the shot where
9  you were when these gentleman -- Neill Bassi and the
10  other door guy charged.
11     A   I was probably more to the right.  Right
12  there.
13     Q   So you moved a step or two to the right?
14     A   Right.
15     Q   And --
16     A   My brother probably moved a little bit over
17  there.
18     Q   And how far away from you were these
19  employees when they commenced this charge toward you?
20     A   Come again?
21     Q   How far away were these Smith Point
22  employees that you allege charged you from you when

DEPOSITION OF CASEY T. PATTEN
CONDUCTED ON WEDNESDAY, FEBRUARY 20, 2008

213

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2          I, Alda Mandell, Registered Professional

3  Reporter, the officer before whom the foregoing

4  proceedings were taken, do hereby certify that the

5  foregoing transcript is a true and correct record of

6  the proceedings; that said proceedings were taken by

7  me stenographically and thereafter reduced to

8  typewriting under my supervision; and that I am

9  neither counsel for, related to, nor employed by any

10 of the parties to this case and have no interest,

11 financial or otherwise, in its outcome.

12      IN WITNESS WHEREOF, I have hereunto set my hand

13 and affixed my notarial seal this 4th day of March,

14 2008.

15 My commission expires:

16 July 31, 2012

17

18

19 _Alda Mandell_
   _____

20 NOTARY PUBLIC IN AND FOR THE

21 DISTRICT OF COLUMBIA

22

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

2

3    - - - - - - - - - - - - - -+

                                     ORIGINAL

4    NEILL S. BASSI,                 |
                                     |
5                 Plaintiff,         |   Civil Action No.:
                                     |
6       vs.                          |   07-1277 (JDB)
                                     |
7    JARROD M. PATTEN, et al,        |
                                     |
8                 Defendants.        |
                                     |
9    - - - - - - - - - - - - - -+

10

11        Videotaped Deposition of Jarrod M. Patten

12                   Washington, D.C.

13            Monday, November 5, 2007

14                   12:57 p.m.

15

16

17

18

19

20   Job No. 1-115020

21   Pages 1 - 139

22   Reported by:  Laurie Bangart-Smith


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

4

1          EXAMINATION INDEX

2                                                    PAGE

3   EXAMINATION BY MR. MITCHELL . . . . . . . . .     6

4

5

6

7

8              E X H I B I T S

9          (Attached to the Transcript)

10  DEPOSITION EXHIBIT                              PAGE

11  No. 1    Answer and Counterclaim               40

12  No. 2    Photo                                 52

13  No. 3    Photo                                 72

14

15

16

17

18

19

20

21

22

49

1   on O Street when people are trying to get in.
2       Q   Okay, and who are those friends?
3       A   One is Chris Tavlarides.
4       Q   Anyone else you can name for me?
5       A   Winston Lord, Andrew Taylor.
6       Q   Okay. So if I understand this
7   correctly, when you and Casey were actually
8   approaching the O Street entrance, there was no
9   line as you recall?
10      A   Not that I recall.
11      Q   Just some employees standing near the
12  entrance to Smith Point?
13      A   Yes, inside the threshold of the
14  entrance of Smith Point.
15      Q   Okay. Now, describe for me what those
16  employees looked like.
17      A   Again, I can't recall if it was two or
18  three individuals. The one thing that I do
19  remember is one of them was wearing a red hat.
20  That's, that's what I recall.
21      Q   Okay. Look, if you would, Mr. Patten,
22  to Paragraph Number 2 in the Counterclaim.  It

50

1   says, quote, "Neill Bassi and another man were
2   standing inside the doorway of Smith Point," end
3   quote. Is it fair to say that on January 13th,
4   2007, you didn't know that one of the individuals
5   standing inside the doorway at Smith Point was
6   Neill Bassi, correct?
7       A   That is correct.
8       Q   Can you describe Neill Bassi for me,
9   sitting here today.
10      A   I can describe him. Six-one,
11  190 pounds. That's about it.
12      Q   Had you ever seen him prior to that
13  evening?
14      A   No, sir.
15      Q   Now, were any of the doors open at that
16  O Street entrance to Smith Point?
17      A   I can't recall if both of them were
18  open, but I know one was open.
19      Q   Okay. Which one if you recall?
20      A   I believe the one if you're approaching
21  on the right side, but I could -- I could be
22  wrong.

51

1       Q   All right, so as you and your brother
2   approached that doorway where those employees were
3   standing, tell me what you did.
4       A   We walked up to the front.
5       Q   Correct.
6       A   We asked if we can get in. They told us
7   the place was closed. In my estimation it was
8   around 2:20, 2:25, so I was a little perplexed,
9   based on what I had been told earlier from
10  Winston, why we weren't able to be let in. So at
11  that point I asked if one of them would go down
12  and get one of our friends as we were instructed.
13      Q   Okay. How close did you actually get to
14  these two individuals as they shared this
15  information with you?
16      A   They were inside the threshold. I was
17  outside the threshold. You know, I was kind of
18  leaning up against the wall, I believe, on the
19  right-hand side.
20      Q   Okay.
21      A   I would say a foot and a half.
22      Q   Okay.

52

1           MR. MITCHELL:  Mark this, would you
2       please, as Number 2.
3           (Exhibit No. 2 was marked for
4       identification and attached to the deposition
5       transcript.)
6   BY MR. MITCHELL:
7       Q   Mr. Patten, the reporter has handed you
8   what's been marked for identification as Jarrod
9   Patten Deposition Exhibit Number 2.  Do you
10  recognize what's depicted in that photograph?
11      A   Yes, sir.
12      Q   Okay. What is that?
13      A   Those are the doors.
14      Q   Okay, and was -- those are the doors to
15  Smith Point at O Street, correct?
16      A   Yes, sir.
17      Q   Was that right-sided door, as you were
18  standing on the sidewalk, the one that was open
19  when you and your brother approached?
20      A   I believe so. I mean again I can't, I
21  can't recall specifically, but I believe so, yes.
22      Q   Okay, and where exactly on that

53

1   photograph were the employees of Smith Point who
2   you were conversing with standing?
3       A   Do you see the brick?
4       Q   Yes.
5       A   Do you see the concrete?
6       Q   I do.
7       A   The light concrete?
8       Q   Right.
9       A   My recollection is they were standing in
10  the dark concrete.
11      Q   Could you put, with this green Magic
12  Marker, an X where those employees were standing.
13      A   I recollect that they were standing --
14      Q   I appreciate that. Okay, and put, with
15  this red Magic Marker, and put your initials, if
16  you would, I guess "JP," where you were standing
17  when you had this initial conversation with them.
18          Okay, great. I can see it. Appreciate
19  that.
20          Now, I want to understand exactly what
21  you said to those employees when you approached.
22  If you look at Paragraph Number 5 in Exhibit

54

1   Number 1, it indicates that, quote, "Casey Patten
2   and Jarrod Patten asked to enter Smith Point so
3   they could join their friends who were already
4   inside." Do you see that?
5       A   Yes, sir.
6       Q   Is that exactly what you said to those
7   employees of Smith Point?
8       A   I mean the connotation of what we said
9   was exactly that. I mean we asked to be let in,
10  and they told us the place was closed. We said
11  our friends are inside, and the same thing I told
12  you a second ago regarding Winston Lord. Could
13  you please go find our friend. He told us that if
14  we had an issue, to ask one of the doormen to go
15  get him, and he would come out, and that's what we
16  said. I think we said that twice.
17      Q   Did you at any point during this little
18  exchange, Mr. Patten, raise your voice?
19      A   I don't recall raising my voice.
20      Q   Do you think your voice was at the level
21  at which you're expressing these sentiments today
22  in deposition?

55

1       A   Probably. I mean I tend to speak
2   loudly.
3       Q   So you believe you raised your voice,
4   or --
5       A   No, no, but I think naturally my
6   voice -- I speak, you know, above a hushed tone.
7       Q   So is it fair to say that you were the
8   one that was speaking with these employees at
9   Smith Point and not your brother Casey?
10      A   I think initially I was, yes.
11      Q   And you say "initially." Is that
12  because at some point Casey spoke up?
13      A   Yes, I believe so.
14      Q   When did he start saying things?
15      A   I think after two attempts to try to get
16  in and then, you know, an additional attempt or
17  two to try to get them to contact our friend
18  again, and then a fifth attempt to ask them to go
19  get the owner because I was a friend of the owner,
20  in a very nice way. Could you please go get Bo,
21  you know, and see if he can come up here. I think
22  at that time Casey may have, you know, said, you

56

1   know, can you just help us out, you know, what's
2   wrong with you guys, can you please help us out.
3       Q   Okay, and when you made these requests
4   or volunteered these requests to the employees,
5   how did they respond?
6       A   Um, they didn't seem to want to have
7   anything to do with it.
8       Q   What's that mean?
9       A   What does that mean?
10      Q   Yeah.
11      A   They weren't listening. They weren't
12  budging. It had gotten to a point where -- I mean
13  again we were standing outside in the rain. It
14  got to a point where we were almost being
15  antagonized, from my recollection.
16      Q   Now, turn, if you would, looking at
17  Exhibit Number 1, Paragraph Number 9 --
18      A   Yep.
19      Q   -- the Counterclaim indicates that,
20  quote, "Mr. Bassi and the other man responded by
21  taunting Jarrod and Casey Patten," end quote. Do
22  you see that paragraph?

**57**

1    A    Yes, I do, sir.
2    Q    And how would you define "taunting"?
3    A    Well, I would define that -- when we got
4    to, when we got to the stage where we were
5    requesting that they go to get Bo Bassi (sic)
6    because -- and tell them that Jarrod Patten is at
7    the front door, the responses were, "If you know
8    the owner, call him yourself. If you know Bo, you
9    can tell him yourself that you're here."
10    Q    Okay, did you, did you take advantage of
11    those suggestions to call Bo?
12    A    I attempted to, yes.
13    Q    Did you attempt to do that right away
14    after they gave you that advice?
15    A    Yes, I did.
16    Q    And what happened? Did you actually
17    dial Bo's number?
18    A    I tried to find Bo's number as I was
19    standing outside in the rain on my phone.
20    Q    Was Bo's number in your phone?
21    A    Yes, Bo's number was in my phone.
22    Q    Why is that? Is he a friend of yours?

**58**

1    A    Bo is a friend of mine probably over, I
2    would say, maybe the last seven or eight years.
3    When I moved to D.C. initially, he was dating a
4    girl that was friends with a girl that I was
5    dating, and over the years we probably saw each
6    other maybe three or four times. I had run into
7    Bo three years prior in Georgetown on Wisconsin
8    Avenue as I was walking into a meeting on North
9    Wisconsin Avenue, and when I parked he just
10    happened to be walking down the street. We noted
11    that we hadn't seen each other in years and
12    exchanged numbers. That was probably about three
13    years ago.
14    Q    All right, and in between that sort of
15    offhanded or coincidental running in with Bo
16    Blair, how many times had you actually had
17    communications with him after that point?
18    A    I'm sorry. Could you repeat that.
19    Q    Yeah, terrible question. After that
20    coincidental run-in with Bo, how many times after
21    that did you actually communicate with him?
22    A    Zero.

**59**

1    Q    And how many times did you actually
2    frequent his establishment known as Smith Point
3    after that coincidental run-in?
4    A    Zero.
5    Q    And yet, despite that, you consider him
6    a good friend?
7    A    I consider him a friend, yes. Anytime
8    that I've seen him, which is a handful of times,
9    he is very cordial and he's very nice, but I know
10    that if one of the doormen walked downstairs and
11    mentioned my name to Bo, that he would walk
12    outside immediately.
13    Q    Okay. Now, have you ever been to Bo's
14    house?
15    A    No.
16    Q    Do you know where Bo lives?
17    A    No.
18    Q    Have you ever been on vacation with Bo?
19    A    No.
20    Q    Has Bo ever been to your house?
21    A    No.
22    Q    Now, when these, when these door guys

**60**

1    told you that you should perhaps try to call Bo
2    yourself, did that make you angry?
3    A    No, it shouldn't make me angry. I had
4    just attempted to take their, their suggestions.
5    Q    And where was Casey while this was going
6    on?
7    A    Would you like me to put it on the
8    picture?
9    Q    No. Why don't you just tell me.
10    A    Okay. Standing behind me.
11    Q    So just to get the picture right, you
12    were standing face-to-face with the employees of
13    Smith Point, and Casey was directly behind you?
14    A    Not directly. I would say probably half
15    behind.
16    Q    Was he off your right shoulder or your
17    left shoulder?
18    A    He was off of my left shoulder.
19    Q    Would you say you were determined to get
20    into Smith Point that evening, Mr. Patten?
21    A    No, not that determined. I mean I was a
22    little frustrated that we came all the way across

**69**

1    A   No, because it was around my head.
2    Q   Did you see how the recipient of that
3  punch reacted?
4    A   Yeah, I believe that he actually tried
5  to come at Casey or even possibly throw a punch
6  himself.
7    Q   Immediately?
8    A   Immediately?  This is all happening in a
9  snap second.
10    Q   Let me cut you off there.  My question
11  is:  After your brother threw that first punch, is
12  it your testimony that that employee of Smith
13  Point charged or came after your brother in
14  immediate retaliation?
15    A   No, I think another punch was thrown.
16    Q   Another punch was thrown by whom,
17  Mr. Patten?
18    A   Casey Patten.
19    Q   So let me get this straight.  Your
20  brother throws two punches at the employee of
21  Smith Point, and was this second punch again
22  around you?

**70**

1    A   No, the first punch was around me,
2  around my head.
3    Q   All right.
4    A   When I felt the arm come behind my head,
5  I turned around, because I wasn't sure what in the
6  world was going on, and then I believe that the
7  next punch was thrown with the other hand.
8    Q   All right.  Did you try to restrain your
9  brother after he threw this first punch?
10    A   It happened so fast, that's when
11  everyone started charging out of Smith Point,
12  so . . .
13    Q   That doesn't answer my question.  Did
14  you try to restrain your brother after he threw
15  that first punch at the Smith Point employee?
16    A   I don't recall trying to restrain him.
17    Q   You're bigger than your brother,
18  correct?
19    A   Correct.
20    Q   Does your brother listen to you when you
21  tell him to do things?
22    A   I believe so, yes.

**71**

1    Q   Did you make any attempt to bear-hug
2  your brother or say cool it, no need to throw
3  punches here; yes or no?
4    A   No.
5    Q   Why not?
6    A   Because at that point I was fearful for
7  harm for myself and my brother, because these men
8  were coming out of the Smith Point threshold.
9    Q   At that point had any employee of Smith
10  Point thrown a punch at either you or your
11  brother?
12    A   At that point I believe that the
13  gentleman in the red hat had retaliated.
14    Q   What does that mean?
15    A   Attempted to throw a punch at Casey
16  Patten.
17    Q   And how did that happen in relation to
18  your body?  Was that to your right or to your
19  left?
20    A   Well, the first punch from Casey Patten
21  came behind my head, at which point I turned
22  around this way.  I believe a second punch was

**72**

1  thrown, which, as I was staring back, came this
2  way, and then I believe that the guy in the red
3  hat went after Casey, and I think he was behind my
4  back here.
5    Q   Where was Neill Bassi during this little
6  exchange of -- volley of punches?
7    A   Again at this point I assume that the
8  gentlemen were standing inside of, of the door,
9  and then now this is when people started to push
10  outside of the door.
11    Q   Okay, and I want to get an idea of where
12  everybody was when the punches started flying.
13    MR. MITCHELL:  That's Number 3, Madam
14  Reporter.
15    (Exhibit No. 3 was marked for
16  identification and attached to the deposition
17  transcript.)
18    MR. MITCHELL:  Can we go off the record
19  for just a second.
20    THE VIDEOGRAPHER:  Going off the record.
21  The time is 1:48 p.m.
22    (Whereupon, a short recess was taken.)

139

1

2

3

4    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

5         I, Laurie Bangart-Smith, Registered
     Professional Reporter, the officer before

6    whom the foregoing deposition was taken, do
     hereby certify that the foregoing transcript

7    is a true and correct record of the testimony
     given; that said testimony was taken by me

8    stenographically and thereafter reduced to
     typewriting under my supervision; and that I

9    am neither counsel for, related to, nor
     employed by any of the parties to this case

10   and have no interest, financial or otherwise,
     in its outcome.

11

          IN WITNESS WHEREOF, I have hereunto set

12   my hand and affixed my notarial seal this
     12th day of November, 2007.

13

14    My commission expires:  March 14th, 2011

15

16   _Laurie Bangart-Smith_

17   _____

18   LAURIE BANGART-SMITH
     NOTARY PUBLIC IN AND FOR

19   THE DISTRICT OF COLUMBIA

20

21

22

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

| | |
|---|---|
| NEILL S. BASSI, | ) |
| | ) |
| Plaintiff/ | ) |
| Counter-Defendant, | ) |
| | ) |
| vs. | ) Civil Action |
| | ) No. 06-1277 |
| JARROD M. PATTEN, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| CASEY T. PATTEN, | ) |
| | ) |
| Defendant/ | ) |
| Counter-Plaintiff. | ) |
| _____ | ) |
| | ) |
| JARROD M. PATTEN, | ) |
| | ) |
| Defendant/Third-Party | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| CASEY T. PATTEN, | ) |
| | ) |
| Defendant/Counter- | ) |
| Plaintiff/Third-Party | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GREG DAVIS, | ) |
| | ) |
| Third-Party Defendant. | ) |
| _____ | ) |

VIDEOTAPED DEPOSITION OF HANNAH J. FREEMAN

WEDNESDAY, MARCH 26, 2008

1

11:09:22  1    remember what they were wearing?

11:09:25  2        A    The bouncer that was speaking was wearing a

11:09:27  3    jacket.  It was cold.  He had a jacket and a hat on,

11:09:31  4    one of the men.  That's all I remember about one of

11:09:33  5    them.

11:09:34  6        Q    Do you -- Approximately how big was he?

11:09:36  7        A    Not -- the man I'm remembering was not a

11:09:38  8    very big man.

11:09:39  9        Q    Bigger --

11:09:39 10        A    Thin.

11:09:39 11        Q    -- than Casey?  Bigger than Jarrod?  Use

11:09:43 12    any references that can help us out here.

11:09:45 13        A    Probably height-wise, around the same size

11:09:48 14    as Casey; but I remember him being very thin.

11:09:51 15        Q    White or black?

11:09:52 16        A    White.

11:09:52 17        Q    Okay.  So after Jarrod says something to

11:09:55 18    the effect of "Do you know who we are?" what do you

11:09:58 19    next recall happening in terms of the conversation

11:10:00 20    and the process?

11:10:01 21        A    Everything happened very quickly.  Casey

11:10:05 22    started getting really loud and yelling that he

11:10:06 23    wanted in and this guy was an asshole and to let

11:10:11 24    them in and to go get the owner of the bar.

11:10:15 25             At that point I started to move kind of

                                                            34

11:10:17  1    inside the door, in Exhibit 2 where the door is

11:10:21  2    open.

11:10:21  3        Q    Yeah.

11:10:22  4        A    I came directly in front of the right-hand

11:10:25  5    door.  And they were yelling.  And that's when the

11:10:28  6    bouncer said to calm down, he was going to call the

11:10:30  7    police.

11:10:31  8             And then all of a sudden I had a punch in

11:10:33  9    my face.

11:10:34  10       Q    Okay.  Let's mark the first -- You have

11:10:37  11   your little circle with "H" on it.  Let's mark that

11:10:39  12   "H1."

11:10:40  13            And can you -- Do you remember where, when

11:10:44  14   the conversation started, where the doorman was

11:10:46  15   standing or sitting?

11:10:47  16            First of all, was he standing or sitting?

11:10:49  17       A    The doorman was standing.

11:10:51  18       Q    Do you remember where he was when the

11:10:53  19   conversation first started?

11:10:54  20       A    Right in the doorway.

11:10:55  21       Q    So why don't you put a little circle with

11:10:57  22   "D" for doorman.  And then if we have to adjust it

11:11:02  23   we can.

11:11:02  24       A    Okay.

11:11:02  25       Q    All right.  Now, you said at some point as

                                                               35

| | | |
|---|---|---|
| 11:11:04 | 1 | this escalated you moved either into or towards the |
| 11:11:07 | 2 | door. |
| 11:11:07 | 3 | A    Correct. |
| 11:11:08 | 4 | Q    So where were you when you got hit?  Mark |
| 11:11:12 | 5 | on the picture "H2." |
| 11:11:15 | 6 | A    I was standing behind the doorman. |
| 11:11:18 | 7 | MR. SOMMERS:  Okay.  The record -- Let the |
| 11:11:20 | 8 | record reflect that she's put an "H2" on Exhibit 2 |
| 11:11:25 | 9 | just at the corner of the doorpost, on the inside |
| 11:11:29 | 10 | edge of the door, i.e., the part of the door that's |
| 11:11:32 | 11 | leading down the corridor into the bar, next to the |
| 11:11:35 | 12 | circle marked "D," which she's put right in the |
| 11:11:37 | 13 | center of the open doorway. |
| 11:11:39 | 14 | Is that clear enough for you guys? |
| 11:11:43 | 15 | MR. MCNAMARA:  Yes. |
| 11:11:43 | 16 | BY MR. SOMMERS: |
| 11:11:44 | 17 | Q    Okay.  So you said that Casey was swearing. |
| 11:11:48 | 18 | Did Jarrod start -- Did Jarrod raise his voice and |
| 11:11:52 | 19 | start arguing? |
| 11:11:52 | 20 | A    When they -- At this point -- Again, it |
| 11:11:55 | 21 | happened very fast, in a matter of 30 to 40 seconds. |
| 11:11:59 | 22 | There was a bunch of screaming.  I started moving |
| 11:12:01 | 23 | inside the door because I felt like it was going to |
| 11:12:04 | 24 | lead into a fight, and I got a little nervous. |
| 11:12:06 | 25 | And Jarrod was talking about letting us in. |

11:12:14  1    And, again, repeated himself about "I'm going to

11:12:17  2    have your job," and just kind of -- in a threatening

11:12:20  3    tone.

11:12:20  4        Q    Had he raised his voice?  Was he yelling?

11:12:22  5        A    Yes, definitely yelling by then.

11:12:24  6        Q    Did he use any profanity?

11:12:28  7        A    Yes.  There was lots of profanity.

11:12:28  8        Q    Now, Jarrod, not just Casey.  You made

11:12:30  9    reference to Casey calling somebody an asshole.

11:12:33 10        A    Mm-hmm.

11:12:33 11        Q    Do you remember whether or not Jarrod used

11:12:34 12    any profanity?

11:12:35 13        A    I don't remember.  I couldn't --

11:12:38 14        Q    Okay.  So describe as precisely as you can

11:12:44 15    the beginning of the physical part of the

11:12:46 16    altercation.  You've given us the verbal part.

11:12:49 17        A    Okay.

11:12:50 18        Q    What's the first thing you can recall

11:12:51 19    happening that was physical?

11:12:53 20             And I'm not just referring to punching.   If

11:12:55 21    there was pushing or shov- -- anything else.

11:12:58 22        A    Okay.

11:12:58 23        Q    Anything beyond talking.

11:13:00 24        A    Jarrod was kind of being protective of

11:13:03 25    Casey because Casey was belligerently drunk.  And

                                                            37

| 11:13:06 | 1 | Jarrod kinda stepped in front of him.  Because Casey |
|---|---|---|
| 11:13:10 | 2 | twice, I think, went to go in to get physical, and |
| 11:13:11 | 3 | his brother stepped in front of him. |
| 11:13:14 | 4 | Q    On this picture, Exhibit 2, is there enough |
| 11:13:16 | 5 | room for you to put Jarrod and Casey in?  Or were |
| 11:13:18 | 6 | they farther away from the doorman than that picture |
| 11:13:22 | 7 | allows you to draw? |
| 11:13:24 | 8 | A    Jarrod was standing in front of the |
| 11:13:26 | 9 | doorman.  And Casey was over to the left, but -- |
| 11:13:30 | 10 | Q    How far -- |
| 11:13:30 | 11 | A    -- probably a little bit further. |
| 11:13:32 | 12 | Q    How far was -- What was the distance |
| 11:13:34 | 13 | between Jarrod and the doorman in terms of |
| 11:13:36 | 14 | face-to-face?  A foot?  Two feet?  Six inches? |
| 11:13:40 | 15 | A    At the beginning when they first started |
| 11:13:41 | 16 | talking, at least a foot.  And then it was getting |
| 11:13:43 | 17 | closer as they started talking.  Jarrod was moving |
| 11:13:46 | 18 | closer to the doormen. |
| 11:13:47 | 19 | Q    Okay.  Why don't you put a "J" -- a little |
| 11:13:50 | 20 | circle with a "J" where you remember Jarrod being |
| 11:13:53 | 21 | before the physical part started and then a "C" for |
| 11:13:58 | 22 | Casey. |
| 11:14:02 | 23 | A    (Complied with request.) |
| 11:14:03 | 24 | MR. SOMMERS:  Okay.  The record -- Let the |
| 11:14:04 | 25 | record reflect that the "J" has been put at the |

1                          CERTIFICATE

2                              OF

3                 CERTIFIED SHORTHAND REPORTER

4

5            The undersigned certified shorthand

6      reporter of the State of California does hereby

7      certify:

8                 That the foregoing videotaped deposition

9      was taken before me at the time and place therein set

10     forth, at which time the witness was duly sworn by

11     me;

12                That the testimony of the witness and all

13     colloquy and objections made at the time of the

14     deposition were recorded stenographically by me and

15     thereafter transcribed, said transcript being a true

16     copy of my shorthand notes thereof.

17                In witness whereof, I have subscribed my

18     name and signature this date, April 4, 2008.

19

20     _____

21               Marla D. Williams

22               CSR No. 11924

23

24      (CERTIFIED COPY REQUIRES ORIGINAL SIGNATURE OF

       REPORTER.  DISMANTLING OF THE ORIGINAL TRANSCRIPT

25     WILL VOID THE REPORTER'S CERTIFICATION.)

                                                   118

[UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| **NEILL S. BASSI** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 07-1277 (JDB)** |
| | ) | |
| **JARROD M. PATTEN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS IN DISPUTE

Plaintiff, Neill S. Bassi, by undersigned counsel, pursuant to LCvR 7(h) and

LCvR 56.1, hereby submits his Counter-Statement of Material Facts as to which there

exists a genuine issue necessary to be litigated.  Additionally, relevant facts omitted from

Defendant Casey Patten's Statement of Material Facts Not In Dispute are set forth below.

Plaintiff submits that it is appropriate for the Court to consider all of the following

asserted facts.

***General Relevant Facts***

1.      At about 10:00 p.m. on Saturday, January 13, 2007, Plaintiff Neill S. Bassi

("Bassi") reported for work as a doorman, aka "door guy," at the bar and restaurant

known as Smith Point.  (Bassi Dep. 38:1-39:2, 2/27/08, Ex. A.)

2.      Smith Point has two entrances: one on Wisconsin Avenue and a side

entrance on O Street.  (Hill Dep. 23: 20-22, Ex. B; Blair Dep. 9:22--10:10, Ex. C.)

3.      The O Street entrance consists of two adjacent independent metal doors,

each hinged on opposite ends of the doorway.  (Photo from J. Patten Dep., Ex. D; Hill

Dep. 24:14-21, Ex. B.)

4.      Although Smith Point opened for business at 6:30 p.m. that Saturday night, (Blair Dep. 8:4-6, Ex. C), the O Street entrance did not open until 11:00 p.m. (Blair Dep. 11:10-11, Ex. C.)

5.      Bassi and two other door guys -- Mike Hill and Greg Davis -- worked the O Street entrance that night. (Blair Dep. 10:8-10, Ex. C.)

6.      Once the O Street entrance opened that evening, Bassi's job was to sit inside the doorway and collect money from patrons who were on Smith Point's guest list. (Bassi Answer to Interrog. #2, Ex. E.)  Mike Hill and Greg Davis stood outside the doorway on the O Street sidewalk where they checked id's with the guest list, and controlled admission to the bar. (Bassi Dep. 7:11-13, 3/18/08, Ex. F; Hill Dep. 30:10-15, Ex. B.)

7.      Smith Point had a strict policy that nobody was let in after 2:00 a.m. (Blair Dep. 10:13-14, Ex. C.)

***Events Before Jarrod Patten and Casey Patten Arrive at Smith Point***

8.      At 2:00 a.m. on Sunday, January 17, 2007, Bassi, Hill, and Davis stopped admitting patrons at the O Street doorway. (Bassi Dep. 40:22-41:1, 2/27/08, Ex. A.)

9.      Accordingly, Bassi, Hill, and Davis dismantled the ropes and poles used for crowd control, took the guest list downstairs to the bar, and delivered the cover charges to Robert "Bo" Blair, the owner of Smith Point. (Bassi Dep. 7:14-18, 3/18/08, Ex. F.)

10.     With the O Street entrance thus closed for admitting patrons, Bassi stood at the threshold of the open metal door, with Hill beside him.  (Hill Dep. 31:10-22, Ex. B.)

***Jarrod Patten and Casey Patten Approach Bassi at the O Street Entrance***

11.     At about 2:30 a.m., Defendants Jarrod Patten and Casey Patten approached the O Street entrance, (Pl.'s Answer to Interrog. #2, Ex. E), where Bassi and Hill were standing inside the door. (Bassi Dep. 46:1--47:16, 2/27/08, Ex. A.; Hill Dep. 32:4-7, Ex. B.)

12.     When they reached the doorway where Bassi and Hill were standing, Jarrod Patten was in front of Casey Patten. (Hill Dep. 39:12-13, Ex. B.)

13.     To Bassi, Jarrod Patten appeared large, about 6'3" or 6'4" tall, weighing 220-230 pounds, with a long dark coat.  (Bassi Dep. 41:6-12, 2/27/08, Ex. A.)

14.     The Pattens asked to be let into Smith Point, to which Bassi replied "no, the doors are closed." (Bassi Dep. 50:6-7, 2/27/08, Ex. A.)  The Pattens responded by telling Bassi and Hill that they were on the list and should be admitted.  Bassi and Hill told the Pattens "no more list tonight, the bar is closed." (Bassi Dep. 50:8-9, Ex. A.)

15.     Jarrod Patten became aggressive.  He told Bassi that he was on the list, he knew Bo Blair, and he demanded that Bassi go fetch Bo Blair for him. (Bassi Dep. 50:9-20, 2/27/08, Ex. A.)

16.     The Pattens appeared intoxicated to Bassi. (Pl.'s Answer to Interrog. #2, Ex. E)

17.     Both Pattens had been drinking intoxicating beverages before they confronted Bassi at the O Street entrance. Jarrod Patten had consumed at least two to three bottles of beer, two to three vodka drinks, and one tequila shot that evening by the time he approached Bassi.  (Jarrod Patten's Resp. to Pl.'s Req. for Admis., #2, #7, #8, Ex. G.)

18.     By the time Casey Patten approached Bassi at the O Street entrance, he had consumed at least five beers earlier that evening at his home (Casey Patten's Answer to Interrog. # 7, Ex. H), where he hosted a party. (Casey Patten Dep. 34:6--35:8, Ex. J.)

19.     In addition, Casey Patten had consumed at least three tequila shots in the two hours before he arrived at Smith Point. (Casey Patten's Response to Pl.'s Req. for Admis., #5, #6, Ex. I.)

20.     Bassi responded to Jarrod Patten's demand by telling him that if he knew Bo Blair, he should call Bo Blair himself, who would come get him personally.  (Bassi Dep. 50:11-12, 2/27/08, Ex. A.)

21.     When Jarrod Patten and Casey Patten heard Bassi's suggestion, Jarrod Patten cursed Bassi, and demanded more aggressively that Bassi fetch Bo Blair. (Bassi Answer to Interrog #2, Ex. E; Bassi Dep. 53:16-19, 2/27/08, Ex. A.)

22.     Casey Patten berated and yelled at Bassi and Mike Hill too. (J. Patten Dep. 55:14-56:2, Ex. K; Hill Dep. 41:9-10, Ex. B.)

23.     With the Pattens' hostility growing, Bassi turned away from the Pattens, called out to Greg Davis behind him, and asked Davis to take his place in front of the Pattens, which Davis did.  Bassi then stepped back from the threshold (Bassi Dep.53:16--55:19, 2/27/08, Ex. A.)

24.     Bassi stood behind Hill. (Hill Dep. 40:1-2, Ex. B.)

25.     When Greg Davis replaced Bassi in front of the Pattens, Jarrod Patten moved closer to the door guys, and ratcheted up his verbal abuse.  (Bassi Dep. 54:22--55:3, 2/27/08, Ex. A.)

26.    Bassi stood about five or six feet back from the threshold. (Bassi Dep. 55:18, 2/27/08, Ex. A.)

27.    From this position, Bassi saw Jarrod Patten move toward the door guys, namely Davis, Hill, and Bassi.  (Bassi Dep. 54:22--56:16, 2/27/08, Ex. A.)

28.    Bassi heard Jarrod Patten threaten the door guys with "Do you know who the fuck *we* are? *We* own this city." (Bassi Dep. 54:22--55:3, 2/27/08, Ex. A)(emphasis added.)

29.    Bassi could also see Casey Patten from his position behind Hill. (Bassi Dep 56:14-16, 2/27/08, Ex. A.)

30.    Casey Patten cursed and yelled more loudly at the door guys. (Hannah Freeman Dep. 34:17-24, Ex. L.)

31.    Bassi, Hill, and Davis told the Pattens that they were going to call the police if the Pattens did not leave.  (Bassi Dep. 62:22--63:1, 2/27/08, Ex. A.)

32.    The Pattens held their position in front of the door guys, shouting insults at them. (Freeman Dep. 36:22--37:7, Ex. L.)

***Violence Erupts When Casey Patten Begins Throwing Punches***

33.    Bassi saw Casey Patten, who was standing partially behind Jarrod Patten, throw a punch at Hill which hit him in the face. (Bassi Dep. 57:8-18, 2/27/08, Ex. A.)

34.    Jarrod Patten stood in Mike Hill's way after Casey Patten's punch struck him. (Hill Dep. 40:12-18, Ex. B.)

35.    Bassi saw Hill reach out and attempt to grab Jarrod Patten,  (Bassi Dep. 58:12-15, 2/27/08, Ex.A), with Casey Patten still standing behind him. (Bassi Dep. 59:10-12, 2/27/08, Ex. A.)

36.    Bassi saw Jarrod Patten resist Hill's attempts to grab him, (Bassi Dep. 59:15-16, 2/27/08, Ex. A), at which point, Bassi saw Casey Patten throw a second punch at Hill. (Bassi Dep. 61:8-10, 2/27/08, Ex. A.)

37.    Bassi saw Casey Patten's second punch strike a female bystander, Hannah Freeman, who was next to Hill. (Bassi Dep. 61:17-22, 2/27/08)(Ex A.)

38.    Jarrod Patten did not take try restrain Casey Patten, physically or verbally, after Casey Patten punched Hill or Ms. Freeman. (J. Patten Dep. 70:8--71:4, Ex. K.)

39.    After Casey Patten's second punch struck Hannah Freeman, Bassi saw Davis and Hill step over the threshold and move to their right. (Pl.'s Answer to Interrog. # 2, Ex. E; Bassi Dep. 63:9-11, 2/27/08, Ex A.)

40.    Bassi then moved forward and stepped through the doorway of the O Street entrance onto the sidewalk, at which point Jarrod Patten, no longer outnumbered by door guys in front of him, charged Bassi, grabbed his right arm, and wrenched it behind his back, injuring Bassi. Jarrod Patten then released Bassi's arm. (Pl.'s Answer to Interrog. # 2, 4-5, Ex. E.)

41.    As soon as Jarrod Patten released Bassi's arm, Casey Patten charged Bassi. (Bassi Dep. 70:1-4, 2/27/08, Ex. A.)   Bassi fended off Casey Patten's charge by using his body, left arm, and Casey Patten's momentum to roll Casey Patten to the ground. (Pl.'s Answer Interrog. #2, 5, Ex. E; Bassi Dep.18:4-10, 3/18/08, Ex. F.)

42.    Casey Patten initially resisted Bassi's attempts to restrain him. Within moments, however, he relented, at which point Bassi stood up and went through the O Street entrance to find Bo Blair. (Pl.'s Answer to Interrog. #5, Ex. E; Bassi Dep. 74:5-7, 2/27/08, Ex. A.)

43.     When Bo Blair arrived at the O Street entrance, he saw an intoxicated

Casey Patten screaming, yelling, and acting very aggressively toward him. (Blair Dep.

18:3--19:9, Ex. C.)

Respectfully submitted,

BODE & GRENIER, LLP

/s/ _____
Eric D. Mitchell (D.C. Bar No. 438607)
Bode & Grenier, L.L.P.
1150 Connecticut Avenue, NW
Ninth Floor
Washington D.C. 20036
Phone: (202) 828-4100
Fax: (202) 828-4130
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of July  2008, a copy of the foregoing
document was served by electronic filing upon all counsel in this case.

___/s/_____
Eric D. Mitchell

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| **NEILL S. BASSI** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 07-1277 (JDB)** |
| | ) | |
| **JARROD M. PATTEN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

UPON CONSIDERATION of Defendant/Counter-Plaintiff/Third-Party Plaintiff

Casey T. Patten's Motion for Summary Judgment, Plaintiff's opposition thereto, the

replies, and the entire record herein, it is this _____ day of _____, 2008,

hereby

ORDERED, that Casey T. Patten's Motion for Summary Judgment is hereby

DENIED.

_____

JOHN D. BATES
UNITED STATES DISTRICT JUDGE

cc
Eric D. Mitchell, Esq.
Bode & Grenier, L.L.P.
1150 Connecticut Avenue, NW
Ninth Floor
Washington D.C. 20036

Angela D. Sheehan, Esq.
Gorman & Williams
Two North Charles Street
Suite 750
Baltimore, MD 21201

Steven J. McCool, Esq.
Daniel T. McNamara, Esq.
Mallon & McCool, LLC.
1776 K Street, N.W.
Suite 200
Washington D.C. 20006

Barry Coburn, Esq.
Jeff Coffman, Esq.
Coburn & Coffman, PLLC
1244 19th Street, N.W.
Washington, D.C. 20036